689 A.2d 757

CHARLES KURAK AND PRISCILLA KURAK, HIS WIFE, PLAINTIFFS–RESPONDENTS, v. A.P. GREEN REFRACTORIES COMPANY, ARMSTRONG WORLD INDUSTRIES, INC., THE ANCHOR PACKING COMPANY, BABCOCK & WILCOX COMPANY, CALON INSULATION CORPORATION, COMBUSTION ENGINEERING, COOPER INDUSTRIES, INC., EASTERN STEAM SPECIALTIES, F.M. ROJEK, INC., FLEXITALLIC, INC., FOSTER WHEELER CORPORATION, FRICK COMPANY, GAF CORPORATION, GARLOCK, INC., INGERSOLL RAND CO., KAISER

ALUMINUM & CHEMICAL CORP., KEENE CORPORATION, MADSEN & HOWELL, INC., NORRIS INSULATION, INC., PITTSBURGH CORNING CORPORATION, PORTER HAYDEN COMPANY, ROBERT A. KEASBEY COMPANY, ROCKWOOL MANUFACTURING CO., ROOTS CONNERSVILLE, STATE INSULATION CORPORATION, TURNER & NEWALL, P.L.C., U.S. GYPSUM CO., WORTHINGTON CORPORATION, AND YORK INDUSTRIES, INC., DEFENDANTS, AND OWENS–CORNING FIBERGLAS CORPORATION AND OWENS–ILLINOIS, INC., DEFENDANTS-APPELLANTS.

Superior Court of New Jersey
Appellate Division

Argued January 7, 1997—Decided March 3, 1997.

306

Before Judges MICHELS, KLEINER and COBURN.

*Perry A. Gandelman* argued the cause for appellant Owens–Corning Fiberglas Corporation (*Tucker, Biegel & Goldstein,* attorneys; *Frederick E. Blakelock,* on the brief).

*Thomas W. Ladd* argued the cause for appellant Owens–Illinois, Inc. (*McCarter & English,* attorneys; *Andrew T. Berry* and *John C. Garde,* of counsel; *Mr. Ladd, Mr. Garde* and *Cynthia C. Beagles,* on the brief).

*Patrick J. Bartels* argued the cause for respondents (*Garruto Cantor Trial Lawyers,* attorneys; *Jane B. Cantor* and *Mr. Bartels,* of counsel; *Mr. Bartels,* on the brief).

The opinion of the court was delivered by

COBURN, J.S.C. (temporarily assigned).

In separate appeals, which we have consolidated, defendants Owens–Corning Fiberglas Corporation (OCF) and Owens–Illinois, Inc. (OI) seek reversal of Law Division judgments, following a trial by jury, awarding plaintiffs Charles Kurak (plaintiff) and his

wife, Priscilla Kurak, damages in this personal injury, products liability action.

The jury determined that plaintiff had contracted mesothelioma, a cancer of the lining of the lung which can only be caused by asbestos, as a result of exposure over forty-four years to asbestos-containing products in his workplace at E.R. Squibb and Sons, Inc. (Squibb). The jury assessed responsibility against defendants (including other named defendants who did not participate in the trial) in the following proportions: OCF (25%); OI (20%); Calon Insulation Corporation (15%); GAF Corporation (15%); Porter Hayden Company (10%); Robert A. Keasbey Company (7%); State Insulation Corporation (8%); and 0% as to Anchor Packing Company, Combustion Engineering, Garlock, Inc., Ingersoll Rand Co., Madsen & Howell, Inc., and U.S. Gypsum Co.

The jury determined plaintiff's total damages to be $1,500,000 and his wife's to be $800,000. The trial court molded the verdict to reflect judgments, with interest as of December 16, 1994, as follows: for plaintiff against OCF, $413,758.54, and against OI, $331,066.83; for plaintiff's wife on her derivative claims against OCF, $220,671.21, and against OI, $176,536.97.

The primary contention of both defendants is that the trial court erred in failing to grant their motions for directed verdicts and judgments notwithstanding the verdicts. Alternatively, they contend the court should have granted their motions for a new trial. Their appeals primarily focus upon claims of lack of product identification respecting the issue of proximate cause. In other words, each defendant contends that plaintiff failed to prove sufficient exposure to its asbestos-containing product to warrant a finding that its product was a medical cause of plaintiff's mesothelioma. They also contend the trial court committed errors relating solely to the issue of damages which resulted in inflated and excessive monetary awards. We agree that there was insufficient evidence against defendant Owens–Illinois, Inc., and that it was entitled to judgment. The jury's finding of liability as to Owens–Corning Fiberglas Corporation, on the other hand, was supported

by the evidence. However, the trial court committed reversible error on an issue relating to damages. Consequently, for the reasons stated in section IV, *infra*, plaintiffs will have to decide whether to have a new trial on damages with OCF's percentage of fault set at the twenty-five percent adjudicated in this trial, or a new trial on liability and damages.

## I

Plaintiff began working for Squibb in 1944 when he was eighteen years old. After forty-four years as a laboratory technician at the Squibb plant in New Brunswick, New Jersey, he retired in 1988 at age sixty-two. Four years later, his physician told him he had contracted mesothelioma, an invariably fatal disease. The parties stipulated that the average life expectancy for a person who has been diagnosed with mesothelioma is six months to two years, although some people have lived as long as eight years.

When plaintiff began working for Squibb at its ninety-six acre New Brunswick site, the plant consisted of about thirty buildings. At his retirement, there were around thirty to forty buildings. During the forty-four years, some buildings were razed to be replaced by new installations.

Plaintiff's work primarily took place in various buildings over the years in laboratory rooms which were about forty feet long and fifteen to twenty feet wide. He first worked in building 80–84 for about eleven years from 1944 until about 1955. Then he spent about seven years in building 70. Around 1962 he moved to building 54; and around 1966 he moved to a new building, number 102, where he stayed until around 1972. From then until his retirement in 1988, he was assigned to the environmental control department, working first for a month in building 78 and then primarily out of building 101, the "Institute", for about three years, and then out of building 92, a new building. As part of this last job, he would regularly, mostly on a monthly basis, enter and work in buildings 89, 90, 91, 105, 107, and 109. He would occasionally spend time in buildings 62, 82, 83, 85, 124. In

summary, he spent substantial periods of time working in buildings 80–84 (eleven years), 70 (seven years), 54 (four years), 102 (six years), 78 (one month), 101 (three years) and 92 (thirteen years).

According to plaintiff, all the buildings in which he worked were warmed by forced air heaters which were fed steam from visible, insulated pipes. The insulation was "whitish-gray." It was almost uniformly "deteriorating, cracking, crumbling, peeling and flaking" in every room in which he worked. Generally, he worked for substantial periods of time within six to twenty feet of the "hot" pipes and the fans which circulated the hot air. He frequently observed dust on the pipes and noticed that the fans blew that dust out into the workplace. When he worked in building 78 for a month in 1972 with a machine known as an "autoclave," a device for "sterilizing media ... or contaminated glassware or equipment," which was about four feet by six feet, he noted that it was covered with whitish-gray insulation which would dislodge when he brushed against it. He described the pipes in buildings 89, 90, and 91 as "covered with dust." In the early 1950's, sometime before 1953, he saw pipefitters working in building 80–84. Their work caused "whitish gray" debris, an insulating material not specifically described as containing asbestos, to fall all around the plaintiff for about a minute until he walked away. That is the only occasion on which plaintiff said he was covered with a dusty material which might have been asbestos.

According to plaintiff's expert witnesses, whose testimony was uncontradicted, plaintiff contracted mesothelioma as a result of his exposure to asbestos during his forty-four year employment at Squibb. They also indicated that unlike asbestosis or cancer of the lung caused by asbestos, mesothelioma, a cancer of the lining of the lung, can be caused by relatively small exposures to asbestos, but that all exposures to asbestos contributed to the disease process. This brings us to the testimony bearing upon the critical liability issue. For even assuming asbestos caused plaintiff's fatal illness, a point no longer at issue in this case, to recover

damages he must still prove the source of that asbestos was the asbestos-containing product of a particular defendant. In that regard, we must carefully consider the testimony in relation to plaintiff's work history.

OI began manufacturing Kaylo, an asbestos-containing hot pipe insulating cover, and asbestos block, sheets of insulating material, in 1948. In 1953, OCF became the exclusive distributor of these materials for OI. In 1958, OCF purchased the business from OI and continued to use the brand name "Kaylo." In 1972, OCF stopped manufacturing these materials.

On the issue of product identification plaintiff relied primarily on the testimony of four witnesses: Frank Abode (so described at trial, but referred to by the parties in their briefs as Frank Abate), Frank Montzi, John Horvath, and Michael Furchak.

Abode came to work at Squibb as a painter in 1945. From 1957 to 1981 he was the supervisor of the painting and insulation department. According to him, about half the hot pipe insulation used by his staff was Kaylo, at least after 1962. He also said one of the painters' jobs was painting the asbestos-containing block and pipecovering. Other witnesses indicated that Squibb had a crew of about eight insulators whose primary job was the installation and repair of insulating material on a daily basis. However, major insulation jobs were performed by outside contractors.

Montzi worked as an insulator at Squibb from 1969 to 1988. When he started at Squibb, he "mostly used" Kaylo tubes for hot pipes, he worked all over the plant doing "quite a bit" of pipe insulation repair, and he put Kaylo in buildings 70, 80–84, 90, 92, 105, 107, 109, and in "a lot of buildings." Although Kaylo is pink in color, he said that once it was cut it "would make a lot of white dust." (Plaintiff worked his last thirteen years in building 92 and would visit, among others, buildings 105, 107, and 109 during that time on a monthly basis.)

Horvath worked at Squibb as an insulator from 1962 to 1985. He said he worked on pipe and block insulation "throughout the

whole plant." He did not indicate what percentage was Kaylo, though he did say it was used.

Furchak was the President of Caylon Insulation Company. He started the business in 1964 and went out of business in 1986. He supplied Squibb with insulation. OCF was his major supplier and most of the pipe covering material he, in turn, supplied to Squibb was Kaylo. However, he could not estimate how much he supplied over the years. Nor was there any indication of the percentage of Squibb's insulation business which came to his company.

There was considerable testimony with respect to Squibb's use of asbestos pipe covering material and other asbestos-containing products made by defendants other than OCF and OI. Indeed, there was evidence from defendants indicating that up until the 1960's most of the asbestos-containing materials used at Squibb came from Johns–Manville and other companies.

## II

Plaintiff contends that the above evidence shows that fifty percent of the pipe covering in the buildings comprising the plant was Kaylo. However, at best, the evidence shows that substantial amounts of asbestos-containing Kaylo were present throughout the facilities sometime after 1958. While the Squibb insulators may have been using Kaylo fifty percent of the time, much of the insulation work was also done by the outside contractors, only some of which used Kaylo. Nonetheless, plaintiff has shown that he was probably exposed to Kaylo in relatively close quarters for a number of years, particularly while working steadily in building 92 (for his last thirteen years) where Montzi said he installed it, as well as on a monthly basis during those last thirteen years in buildings 90, 105, 107, and 109, where Montzi also recalled installing this product. That exposure must be considered in relation to the uncontradicted medical testimony indicating that far less exposure to asbestos can cause mesothelioma than is required for other asbestos related diseases and that cumulative exposures

increase the probability that a person will develop this fatal cancer.

Defendants contend the trial court improperly denied their motions for directed verdicts and for judgments notwithstanding the jury's verdict. Although according to them, plaintiff failed to prove that either of their products was a proximate cause of plaintiff's mesothelioma, they are not contending in this appeal that the disease was not caused by exposure to asbestos in the Squibb plant. Rather, the contention is that plaintiff failed to prove proximate cause in the sense that as to each defendant there was insufficient evidence its product was a substantial factor in causing or exacerbating the disease.

The leading case in New Jersey on this aspect of causation is *Sholtis v. American Cyanamid Co.*, 238 *N.J.Super.* 8, 568 *A.*2d 1196 (App.Div.1989). The court held that to prevail against a particular defendant in an asbestos case, the plaintiff must provide sufficient direct or circumstantial evidence from which a reasonable jury could infer that "sometime during [his] work histor[y] ... [he] was exposed to a defendant's friable asbestos frequently and on a regular basis, while [he] was in close proximity to it (balancing these factors) ..." *Id.* at 31, 568 *A.*2d 1196. In addition, of course, there must be "competent evidence, usually supplied by expert proof, establish[ing] a nexus between the exposure and plaintiff's condition ..." *Ibid.* This is the so-called "frequency, regularity and proximity test" adopted by most courts confronted with this issue. *Id.* at 28–29, 568 *A.*2d 1196. Under this test, plaintiff cannot rest on evidence which merely demonstrates that a defendant's asbestos product was present in the workplace or that he had "casual or minimal exposure" to it. *Goss v. American Cyanamid Co.*, 278 *N.J.Super.* 227, 236, 650 *A.*2d 1001 (App.Div.1994).

In adopting for New Jersey the "frequency, regularity and proximity test" for medical proximate cause in asbestos cases, the *Sholtis* court was careful to point out the distinction between causation and allocation of fault among numerous defendants

whose product may have contributed in varying degrees to the resulting disease. In that case, ninety percent of the asbestos delivered to the plant where plaintiffs worked was manufactured by Johns–Manville which was then not subject to suit due to bankruptcy. *Id.* at 20 n. 7, 568 *A*.2d 1196. The court said:

> Plaintiffs have been exposed to multiple products over a long period of time, but one manufacturer, Johns–Manville, apparently has been responsible for the vast majority of the exposures. In such a case, can the exposure to products constituting but five to ten percent of the friable asbestos at American Cyanamid be considered a proximate cause of Sholtis' death and Lee's injuries? At the outset, we state that for a defendant to be held liable, the exposure to the products of such defendant, whether proven directly or circumstantially, or if reconstructed or even risk-weighted, must have been a proximate cause of, *i.e.,* a substantial factor in bringing about, plaintiffs' injuries. If the potentially culpable Wellington defendants (apart from Porter Hayden) were each responsible for a fractional share of the remaining five to ten percent, a jury might have a hard time finding that their products were substantial factors contributing to plaintiffs' asbestosis. Additionally, there have been several other settling defendants whose products would be required to be similarly analyzed on a proximate cause basis, thus reducing the Wellington defendants' percentages possibly to fractions of one percent. *Young v. Latta,* 233 *N.J.Super.* 520, 523, 559 *A*.2d 465 (App.Div.1989).
>
> Yet should the small percentage involved bar a plaintiff's claim as a matter of law? We know that a five percent finding will sustain liability. *Stephenson v. R.A. Jones & Co., Inc.,* 103 *N.J.* 194, 198–199, 510 *A*.2d 1161 (1986). A plaintiff has a right to a full, not a ninety to ninety-five percent recovery; and even a ninety to ninety-five percent responsible party has a right to contribution under the Joint Tortfeasors Contribution Law, *N.J.S.A.* 2A:53A–1 *et seq.,* and the Comparative Negligence Act, *N.J.S.A.* 2A:15–5.3. The fact that there may be several parties dividing this five to ten percent responsibility should not dilute the rights of a plaintiff or principal defendant.

[*Id.* at 25–6, 568 *A*.2d 1196.]

The court further concluded that defendants should be jointly and severally liable unless they "could better apportion their responsibility." *Id.* at 27–28, 568 *A*.2d 1196.

The issue of product identification has often troubled courts. To place plaintiff's case in proper perspective we review a representative sampling of the reported decisions, beginning with cases in which the plaintiff was unsuccessful.

In *Lohrmann v. Pittsburgh Corning Corp.,* 782 *F*.2d 1156 (4th Cir.1986), an asbestosis case, the court held that summary judgment was properly granted as to defendant Raymark because the

only evidence was four invoices indicating purchases of Raymark asbestos cloth by plaintiff's employer and there was no evidence showing when or where those products were used. *Id.* at 1163. Summary judgment was also held to have been properly granted to defendant Pittsburgh Corning Corporation because plaintiff only testified that "he was exposed to an asbestos-containing pipe covering [made by Pittsburgh] on ten to fifteen occasions of between one and eight hours duration during the term of his employment. * * * [That] exposure to [the pipe covering] was not sufficient to raise a permissible inference that such exposure was a substantial factor in the development of his asbestosis." *Ibid.*

In *Menne v. Celotex Corp.*, 861 *F.*2d 1453 (10th Cir.1988), the plaintiff, a shipyard pipefitter, proved that for about four and one-half years while working in ships he was exposed to asbestos due to his particularly close proximity to insulators who were installing asbestos products and generating asbestos dust on docked ships. Thereafter, for the next thirty years he worked in private industry where he had various exposures to the asbestos products of multiple manufacturers. At age sixty-six, he came down with mesothelioma. Numerous manufacturers of asbestos products were joined as defendants in the suit. Two major contributors of asbestos products to plaintiff's work sites were not defendants. The jury found four asbestos product manufacturers liable. Plaintiff could not identify any particular asbestos products to which he was exposed during his time at the shipyard. However, his key witness was able to identify ten different manufacturers whose products were used at the shipyard during the years in question. According to this witness, he used appellants asbestos products on every ship on which he worked. There was, however, no evidence that he worked on the same ships as plaintiff. The court said:

The testimony was insufficient to establish the likelihood of frequent or sustained exposure to asbestos dust from the products of each appellant, and a jury finding of some Shipyard exposure from each's products is not enough. From the circumstantial evidence, there is no way of ascertaining the regularity or frequency of Menne's exposure to visible asbestos dust from a given defendant's products. Such

exposure might have been frequent or sustained, or it might have been sporadic and short. On this matter the jury could only speculate.

[*Id.* at 1464.]

*See also, Robertson v. Allied Signal, Inc.,* 914 *F.*2d 360 (3rd Cir.1990).

In the following cases, the plaintiff's claims were upheld.

In *Goss v. American Cyanamid, Co., supra,* the court found that the following proofs sufficiently established defendant Porter–Hayden as the supplier of asbestos-containing products which injured plaintiffs:

Goss and Patullo worked in the presence of asbestos dust while employed as departmental mechanics at American Cyanamid. As previously mentioned, Goss spent approximately thirty percent of his work time either applying or removing asbestos insulation. He also repaired boilers which were covered with asbestos-containing insulation after which he would be completely covered with white dust. Patullo inhaled dust which was released when the asbestos-containing insulation materials were cut. Goss and Patullo also were exposed to asbestos indirectly while their co-workers installed the asbestos-containing insulation. In our view, this evidence demonstrated that Goss and Patullo were sufficiently exposed to the asbestos-containing products.

The evidence also demonstrated specifically that Goss and Patullo were exposed to asbestos-containing products that Porter Hayden installed or distributed. According to Goss, most of the asbestos pipe covering that he used was manufactured by Johns–Manville, and he also used corrugated asbestos sheeting manufactured by Johns–Manville once or twice per year. Patullo also installed and removed asbestos-containing pipe covering manufactured by Johns–Manville. Additionally, as previously mentioned, Brandt, one of Goss' and Patullo's co-workers, testified that he used Johns–Manville pipe covering approximately ninety-percent of the time and installed insulation in areas where Goss and Patullo regularly worked. Brandt also recalled that Porter Hayden delivered all the asbestos materials to American Cyanamid.

Porter Hayden acted as an ICU for Johns–Manville from 1927 until the 1960's. During that time, Porter Hayden serviced American Cyanamid as one of its accounts. Porter Hayden's vice-president and one of its managers testified that Porter Hayden supplied Johns–Manville asbestos-containing products to American Cyanamid. Porter Hayden also admitted to this in its answer to interrogatories, which were read to the jury at trial. Even one of Porter Hayden's competitors, Charles S. Woods Company, was required to purchase Johns–Manville materials through Porter Hayden when using those materials at American Cyanamid.

[278 *N.J.Super.* at 237–38, 650 *A.*2d 1001.]

In *Dafler v. Raymark Industries, Inc.,* 259 *N.J.Super.* 17, 611 *A.*2d 136 (App.Div.1992), *aff'd,* 132 *N.J.* 96, 622 *A.*2d 1305 (1993),

the evidence with respect to product identification showed that plaintiff, a shipfitter, had worked for six years during World War II on twelve to thirteen ships at New York Shipyard in Camden, New Jersey. He spent seventy percent of this time in engine and boiler rooms in very close proximity to pipefitters and pipecoverers who used asbestos-containing products. They "worked continuously, cutting and cementing pipes." *Id.* at 23, 611 *A.*2d 136. Their use of asbestos made the air "very dusty." *Ibid.* He could not personally identify any of the asbestos manufacturers. One witness was called on product identification and nexus. He worked in the Shipyard from 1942 to 1944 as a mechanic's helper, putting ventilation systems in boiler rooms and engine rooms of the ships. He worked right next to the shipfitters. He spent ninety percent of his time on the ships and worked on seven ships in common with plaintiff, whom he did not know. About 500 people worked on a ship at the same time. He said the pipefitters' use of asbestos products "created dust to the extent that 'it seemed like a snow storm.'" The air was very dusty with "'various dust and fibers all over our clothes and in our hair.'" On the specific issue of product identification, he said the pipefitters used brands, which he named, of four asbestos manufacturers. He saw these brands daily. He did not estimate the percentage use of each brand, but he saw "more" of the cross-appealing defendant's brand of pipe covering than that made by the other major product contributor. *Id.* at 24, 611 *A.*2d 136. The jury found the cross-appealing defendant 95 percent responsible for plaintiff's lung cancer and asbestosis. *Id.* at 21, 611 *A.*2d 136. The court said:

> On the cross-appeal, we conclude that there was sufficient evidence to create a jury question on Keene's liability. There was also sufficient proof before the jury to allow the inferences of 'frequency, regularity and proximity' of exposure expressed in *Sholtis v. American Cyanamid Co.,* 238 *N.J.Super.* 8, 568 *A.*2d 1196 (App.Div.1989). *See Rotondo v. Keene Corp.,* 956 *F.*2d 436, 441 (3rd Cir.1992), where the Circuit Court, under similar circumstances, affirmed a verdict for the plaintiff who worked on the Monticello at the Philadelphia Naval Shipyard for several months when pipecoverers, in close quarters, used Ehret products about "50% of the time."
>
> [*Id.* at 39, 611 *A.*2d 136.]

A more detailed recitation of the facts of *Rotondo v. Keene Corp.*, 956 *F.*2d 436 (3rd Cir.1992) is useful here. The court said:

> [O]ver an 18–month period ... Rotondo worked for six months as a tacker and for the remainder as a welder at the Philadelphia Naval Ship Yard. * * * [H]e worked on the Monticello for * * * at least 3 to 4 months, a minimum of 2 days per week in the ship's boiler room, working 6 to 8 feet away from the pipecoverers who placed asbestos covering on the pipes. The coverers would saw sections of the covering, causing dust to be released into the air.
>
> [*Id.* at 438.]

The court then noted that another employee who worked in the Monticello while plaintiff was there had the job of lowering boxes of asbestos material into the engine and boiler rooms. He saw "two different names on the boxes he unloaded, Unibestos and Ehret, and he saw them with the same frequency. Moreover, [he] saw pipecoverers using Ehret sections on a regular basis and testified that during the periods when the pipecoverers worked with the Ehret covering the atmosphere was 'like a nice little snow storm.'" *Id.* at 439. Defendant Keene was the provider of the Ehret asbestos piping. Plaintiff contracted mesothelioma from the asbestos. His physician testified that "mesothelioma, unlike other asbestos-related diseases is not dose-dependent, apparently because mesothelioma can result from 'relatively insignificant exposure' to asbestos." *Id.* at 439. The court concluded:

> In summary, the testimony introduced in the instant case did not merely place Ehret pipecovering "somewhere" in a large facility, but rather placed it in the specific area (i.e., the boiler room) in which Rotondo worked. In addition, the evidence established that Rotondo worked in the boiler room of the Monticello at least 2 days a week for at least 3 to 4 months during the summer of 1942, and that the pipecoverers used the Ehret product fifty percent of the time. Even if Rotondo was not exposed to Ehret covering during most of the period that he worked in the boiler room, Dr. DuPont testified that mesothelioma is not dose-dependent and that relatively small amounts of asbestos can cause this condition.
>
> Nor do we agree with Keene that plaintiff presented insufficient evidence from a jury could infer that Rotondo had inhaled asbestos from Ehret covering. Souels testified that it would not be possible for people working around pipecoverers not to breath the dust. Rotondo testified that the boiler room was unventilated, and that his clothes were covered with dust when he worked in the boiler room. Thus, although Dr. DuPont agreed with defendant that only air sampling would positively detect asbestos dust, a jury could properly infer that when covering containing asbestos is sawed and releases dust, that dust contains asbestos. We conclude that plaintiff has presented enough evidence to survive Keene's j.n.o.v. motion, that the

trial court did not err in denying Keene's motions for a directed verdict or j.n.o.v., and that it did not abuse its discretion in denying Keene's motion for a new trial. [*Id.* at 442.]

In *Slaughter v. Southern Talc Co.*, 949 *F*.2d 167 (5th Cir.1991), seventeen plaintiffs contended they contracted asbestos related diseases while working in their factory at General Tire and Rubber Company. The suit named thirteen producers and users of asbestos containing products. Defendant Owens–Corning Fiberglas obtained summary judgment and plaintiffs appealed. The evidence indicated that OCF's Kaylo was delivered to the General Tire Plant from 1960 to 1973 and installed there from 1960 through 1983. The plant building covered about forty-nine acres. Pipefitters and insulators removed deteriorating pipe insulation daily and block insulation weekly throughout the plant. The piping was described as voluminous. Much of the piping was always in " 'disarray.' " *Id.* at 170. Plaintiffs worked near the pipes and found themselves covered on a regular basis with insulation dust whenever the pipes were worked on. Witnesses testified that OCF's Kaylo and block insulation was delivered to the plant and was installed on pipes and other equipment all over the plant from around 1962 until, at least inferably, 1973 when OCF ceased manufacturing asbestos products. Although thirteen asbestos product manufacturer's were sued, the opinion is silent with respect to the presence of their materials in the plant.

The *Slaughter* court described the question of whether there was sufficient evidence of proximate cause as "close." *Id.* at 171. However, it was satisfied that the testimony that Kaylo was all over pipes throughout the plant indicated "a high probability that anyone working near pipes also worked near Kaylo." *Id.* at 172. The court said:

The essence of plaintiffs' proofs of exposure ... rests on the common sense idea that, if defendants' products are *likely* to be present at a specific location within the workplace, plaintiffs are likely to have been exposed to the products if they worked near those specific locations, even without explicit testimony that the plaintiff worked near the specific product. This is an intuitively plausible theory of exposure, accepted repeatedly by this court and also by other courts.

\* \* \* \* \* \* \* \*

> The case is close, and the evidence shown by plaintiffs lies close to the minimum necessary to support a verdict of actual exposure. We cannot say, however, that no reasonable jury could conclude that plaintiffs more probably than not inhaled asbestos fibers from OCF's products.
>
> *[Id. at 172–73.]*

In *Slaughter* there was substantial evidence of asbestos dust repeatedly falling on plaintiffs. That is absent in the subject case. In *Miller v. American President Lines, Ltd.,* 989 *F.*2d 1450 (6th Cir.1993), *cert. denied,* 510 *U.S.* 915, 114 *S.Ct.* 304, 126 *L. Ed.*2d 252 (1993), the court emphasized that the record was "full of evidence concerning the presence of asbestos dust throughout the ships" involved which often "blanketed" the crew. *See also, Jackson v. Anchor Packing Co.,* 994 *F.*2d 1295, 1305 (8th Cir. 1993). However, in *Wehmeier v. UNR Industries, Inc.,* 213 *Ill.App.*3d 6, 157 *Ill.Dec.* 251, 572 *N.E.*2d 320 (1991), the court observed:

> [T]he amount of evidence needed to establish the regularity and frequency of exposure will differ from case to case. For example, none of the plaintiffs in this case was diagnosed with mesothelioma, an asbestos-related disease which is caused after only minor exposure to asbestos dust.
>
> \*　　\*　　\*　　\*　　\*　　\*　　\*　　\*
>
> The substantial factor test is not concerned with the *quantity* of the injury-producing agent or force but rather with its *legal significance.* Where there is competent evidence that one or a *de minimus* number of asbestos fibers can cause injury, a jury may conclude the fibers were a substantial factor in causing a plaintiff's injury.
>
> *[Id. at 268, 572 N.E.2d at 337 (citation omitted).]*

This case would have been easier had plaintiff been able to testify that he often found himself covered with dust. But that is not a legal requirement, at least where mesothelioma is concerned. He certainly placed himself in close proximity in relatively small rooms to asbestos-containing products, mostly pipe coverings, but also block, which were friable in that they were deteriorating, cracking, crumbling, flaking and peeling. He suffered that exposure throughout his career. And for many years he was in rooms which probably contained deteriorating and friable Kaylo in substantial quantities. According to plaintiff, he generally worked within six to twenty feet of heating pipes which were usually laden

with dust. Circulating fans blew that dust in his direction. Defendants emphasize that plaintiff never said he saw pink pipes or block, and Kaylo was uniformly described as pink; but that does not undercut plaintiff's case since these materials were always painted by Squibb employees, and, when it was cut or disturbed, Kaylo yielded white dust.

■ Although there was sufficient evidence of exposure to asbestos, there was not enough evidence to identify OI as a legally responsible source. In an attempt to establish OI's liability plaintiff and his expert witnesses emphasized an incident which occurred in the early 1950's when white dust from pipes fell on him while pipefitters were installing pipe coverings. But, there was insufficient evidence to establish that the material was asbestos, let alone whose product it was. After 1958, OI was no longer involved with Kaylo. Furthermore, there is nothing to indicate, even approximately, how much Kaylo may have been installed in any building in which plaintiff worked prior to 1958. Plaintiff's product identification witnesses simply did not provide testimony on this score. Therefore, we hold the trial court erred in failing to direct a verdict in OI's favor and in thereafter failing to enter a judgment n.o.v. in OI's favor.

■ With regard to OCF, on the other hand, there was sufficient evidence, particularly in light of the nature of mesothelioma and the ease with which it can be contracted, to support the jury's finding of responsibility. The plaintiff was exposed, or so the jury could have found, to friable Kaylo manufactured by OCF for a number of years in close proximity, with regularity, and frequency. Since the liability of OCF was supported by substantial, credible evidence, the trial court was correct in denying OCF's motions for a directed verdict, a judgment n.o.v., and a new trial. *Dolson v. Anastasia*, 55 *N.J.* 2, 5–6, 258 *A.*2d 706 (1969).

### III

Defendants contend the trial court erred by including in the charge to the jury the "model" life expectancy charge because

they say to do so was inconsistent with a stipulation agreed to by the parties respecting the plaintiff's shortened life expectancy resulting from his fatal mesothelioma. Plaintiff argues that the parties did not stipulate to plaintiff's life expectancy, but only to the life expectancy of mesothelioma victims in general. Plaintiff also contends that defendants did not object below on the basis now argued on appeal, but for another invalid reason.

The stipulation developed in the following way. On November 17, 1993, the day before summations, and before both sides rested, there was a discussion on the record with respect to the charge. During this discussion, plaintiff's counsel brought up the subject:

MRS. CANTOR: Judge, there was a stipulation entered into between counsel which I want to put on the record and I want the jury to be informed about it.... The stipulation between counsel was an agreement entered between myself and Mr. Ladd ... on the phone on Monday night before I decided whether to bring Dr. Daum in or not and I said to Mr. Ladd, if you'll agree that mesothelioma is a fatal disease and there is no known cure for this disease I will not bring Dr. Daum in and he agreed and I did not bring my doctor in and so that is the stipulation and I acted upon that stipulation. I would like the jury to be informed of it and I would like to be able to argue it to the jury.

 \* \* \* \* \* \* \* \*

MR. LADD: Well, your Honor ... when we were discussing the stipulation I was asked if I would stipulate to it being a disease where the typical life span is between six and 18 months and I said I couldn't stipulate to that because while I knew Dr. Daum would testify to that by the same token Dr. Daum—if this man were four years out with mesothelioma he (sic) would testify that ... this is still a mesothelioma and you have cases where it's four years out. I think to say to the jury that this is an ... a fatal cancer with no known cure, misrepresents the testimony that we've had in this case and it suggests that the Kuraks have been told that. They have not been told that.

 \* \* \* \* \* \* \* \*

THE COURT: Haven't been told what? That it's fatal ...

MR. LADD: And that there is no known cure, that this is a fatal cancer. \* \* \* Their hope is that they're going to beat their cancer and that ... chemotherapy is going to work.... I think that allows the jury to speculate then ... [a]bout the length of time he's going to be alive.

THE COURT: Well, you just asked me ... yesterday to tell them what his life expectancy is. [Apparently this request was made off the record.]

MRS. CANTOR: Exactly right.

> THE COURT: And that's the time-frame they want future pain and suffering and loss of enjoyment of life to be included for this jury.
>
> MR. LADD: Okay, your Honor.
>
> THE COURT: So I mean with those two aspects of the case I don't know how we can't tell the jury that mesothelioma is fatal and there's no cure, without specifying how long somebody might be expected to live. As you say there were people who live four years.

The attorneys then took a break to work out the terms of the stipulation. When they went back on the record, the following appears:

> THE COURT: Have you agreed to the stipulation now?
>
> MR. LADD: We have. * * * There are now two parts of the stipulation. * * * The first was written here your Honor and I guess we can amend—well we can talk about it at the charge conference but that is the first part of the stipulation—this the second.
>
> \* \* \* \* \* \* \* \*
>
> THE COURT: It is stipulated—well is a fatal disease, there is no known cure, the average life expectancy for a person who has been diagnosed with mesothelioma is six months to two years although some people have lived as long as eight years.

On the next day, November 18, 1993, a charge conference was held on the record. Near the end of that conference, the following discussion took place:

> MR. LADD: * * * I ... want to note for the record my objection to any ... charge concerning future pain and suffering in this case. There's been no evidence whatsoever concerning future pain and suffering, certainly been no medical testimony concerning that. In addition, there's been no testimony from the ... plaintiff or his wife concerning that category of damages, future pain and suffering. * * * I believe that would just be asking the jury to speculate on a number.

The court rejected that position; and then defense counsel said:

> MR. LADD: Lastly, I object to the use, again of the ... life expectancy table. I'm not even sure from the charge how that is exactly going to be used. I know your Honor looked at the table and intends to read the charge. I object to it because I am not sure what the measure of damages is that we're talking about concerning the life expectancy testimony.

We note that up to this point, despite plaintiff's counsel's request that the stipulation be read to the jury, and the absence of any objection to that request, the jury had still not heard it. The next event was summation by counsel. Mr. Ladd made no reference, directly or indirectly, to the stipulation. Mrs. Cantor included in her summation the following remarks on the subject:

In this case we've had a stipulation. It means that there's been agreement between the parties that this must take as fact and stipulation is this. Mesothelioma is a fatal disease and there is no known cure. It is further stipulated that the average life expectancy for a person who has been diagnosed with mesothelioma is six months to two years although some people have lived as long as eight years. That you must take as fact. Now, the Judge is going to tell you that the life expectancy of Charles Kurak if he were healthy today is 15 point 20 years. The Kuraks have told you, they are fighters. They are doing everything they can to fight what is going on. But they cannot fight the facts. Whether Charles will be the one who outlives the eight years and take it to his 15 point 20 years, I can't tell you but I can tell you that this is what is known today and this is agreed upon between counsel.

Defense counsel made no objection to the above comments. As noted, the court included the model charge on life expectancy. However, the only reference in the jury charge to the stipulation was this:

THE COURT: [A]nd another stipulation the attorneys spoke to you about is that Mr. Kurak has mesothelioma and they discussed that in their life expectancy. When something is stipulated then you can accept that, you don't need any further proof about it.

 Apart from rare instances with which we are not concerned in this case, stipulations of fact are binding on the parties. *See Negrotti v. Negrotti,* 98 *N.J.* 428, 487 *A.*2d 328 (1985), where the Court said:

Our decision should in no way be taken as an invitation to litigants or trial courts to sidestep the binding nature of factual stipulations. Quite to the contrary, it is important for attorneys to have confidence in stipulations as a tool to avoid the expense, trouble, and delay of coming forward with proofs when certain otherwise-contestable facts are admitted. The basic thought is that generally litigants should be held to their stipulations and the consequences thereof.

[*Id.* at 432, 487 *A.*2d 328 (citation omitted).]

Stipulations should be construed with reference to their subject matter and in light of the surrounding circumstances, employing the rules applicable to the construction of contracts. *Sheeran v. Sitren,* 168 *N.J.Super.* 402, 413, 403 *A.*2d 53 (Law Div.1979). However, the terms of a stipulation, if it is to be given effect, must be "definite and certain and it is essential they be assented to by the parties or those representing them." *Schere v. Township of Freehold,* 150 *N.J.Super.* 404, 407, 375 *A.*2d 1218 (App.Div.1977).

█ The difficulty with the stipulation in question lies in its ambiguity. Defendants contend that the reference to eight years reflected an agreement that plaintiff could not or would not live beyond eight years after his mesothelioma was diagnosed. But that view of the language of the stipulation is not supported by its express language. Indeed, the express language is to the contrary. The stipulation, as stated on the record outside the presence of the jury and as stated to the jury by plaintiff's counsel, without objection, referred not to plaintiff but to "a person." With respect to what defendant's counsel now views as the outer limit of survival, it merely recited that "some people have lived as long as eight years." That is not the same thing as saying that no one has lived more than eight years. Furthermore, viewed in context, it appears that the eight year period referred to was four more years than plaintiff's doctor was going to state, had he been called. Thus, it would appear that defendants were the ones who were desirous of having an indication to the jury that plaintiff might live substantially beyond the average of six months to two years from diagnosis. We are inclined to infer that defendants may have taken this position to avoid the emotional prejudice which might have resulted from a stipulation which merely had the effect of telling the jury that plaintiff would likely die within a very short time after the trial.

Based on the principles of law cited above, and the circumstances leading to the stipulation, as well as the wording of the stipulation itself, we believe that defendants should not now be permitted to contend that the stipulation meant something other than what it said; and it said no more than that the average person survives six months to two years from diagnosis and some people have lived as long as eight years. It does not say that no one can live beyond the eight year period.

In *Budd v. Erie Lackawanna R.R. Co.*, 98 *N.J.Super.* 47, 236 *A.*2d 143 (App.Div.1967), *certif. denied*, 51 *N.J.* 186, 238 *A.*2d 472 (1968), defendant objected to the introduction of the life expectancy table's figure for the average life span of a person of plaintiff's

age on the ground that plaintiff had previously suffered a heart attack which had reduced his life expectancy. In rejecting that contention, the court said:

> We are satisfied that the table was properly received in evidence regardless of what decedent's condition of health would have been had medical care been furnished so that he had survived the heart attack which overcame him on the day in question. Under our cases the use of such tables is not limited to instances where the deceased enjoys average or better health. In *Camden and Atlantic R.R. Co. v. Williams, supra*, 61 *N.J.L.* [646], at p. 649, 40 A. 634, referring to the *Carlisle Table of Mortality* (from which was derived the table of mortality contained in former *Chancery Rule* 184) it was held:
>
>> It [the table of mortality] was legal evidence irrespective of the condition of health of the deceased, for it is not a table compiled from statistics of selected lives only, but of course such condition had to be taken into account, and testimony on that subject was in fact taken by both parties. The table was not admitted as controlling. The judge said, 'We are not bound by it,' and in his charge to the jury he very clearly and correctly stated the rules governing the estimate of probable duration of life to be made by a jury in awarding damages in cases of injury resulting in death.
>
> And in *Auer v. Sinclair Refining Co.*, 103 *N.J.L.* 372, 137 *A.* 555 (E & A 1927) it was held:
>
>> The general rule is that, while the Carlisle table of mortality is evidential, irrespective of the condition of health of the person whose expectancy of life is the subject of the inquiry, yet that condition of health must be taken into account in determining the probable duration of such person's life. * * * (at p. 375 [137 *A.* 555])
>
> It thus appears that when accompanied by cautionary instructions, the table may be used regardless of decedent's state of health.
>
> [<em>Id.</em> at 53–54, 236 <em>A.2d</em> 143.]

We view *Budd* as properly rejecting the position taken by defendants here. The trial court clearly explained that the life expectancy figure was not controlling and that plaintiff might live for a shorter or longer period of time. The court also reminded the jury of the stipulation in language to which defendants did not object. Furthermore, as we have noted, the use of the life expectancy charge was not inconsistent with the stipulation since it, too, only referred to people in general and to the fact that some people have survived as long as eight years, which is not the same thing as stipulating that no one has lived beyond eight years or that this plaintiff would not live beyond eight years.

■ Last, on this point, we note the utter failure of defense counsel to object before the trial court on the basis suggested on appeal. His objection below was that he was "not sure what the measure of damages is that we're talking about concerning the life expectancy testimony." That is not an objection stated in understandable legal terms. He did not object on the ground that giving the model charge on life expectancy would be inconsistent with the stipulation. Consequently, putting to one side the doctrine of plain error, he is not entitled to complain on appeal with respect to the court's overruling of his objection. R. 1:7–2. To the extent he would rely on the doctrine of plain error, R. 1:7–5, we note that we perceive no error for the reasons stated above, and certainly no plain error.

## IV

Although the use of the life expectancy charge did not compromise the jury's function in assessing damages in the context of this case, the defendants rightly contend that the combination of a question posed by the jury during deliberations and the trial court's response substantially undermined the reliability of the monetary awards.

■ The problem arose because once this jury found OCF and OI liable, it had the additional responsibility of determining whether the eleven defendants who were not participating in the trial (as a result of settlement or other cause) were also liable to plaintiffs, and, if so, to what degree. As a matter of law, the jury was, of course, obliged to apportion fault among the defendants without reference to any effect the apportionment might have on the dollars ultimately received by plaintiffs as a result of the overall assessment of damages. *Theobold v. Angelos*, 40 *N.J.* 295, 191 *A.*2d 465 (1963). Unfortunately, from the jury's question, it appeared that the jury wanted, in violation of its duty, to insure plaintiffs received specific dollar amounts regardless of the apportionment. As will be seen, the trial court failed to instruct in a manner designed to avoid that result.

The only record of the jury's question is contained in the trial court's responsive instruction:

[Will] the amount of damages awarded by the jury be paid in full to the plaintiffs or will they receive the percentages allotted to Owens–Corning Fiberglas and Owens–Illinois? If you allot percentages among the various defendants, then they will receive the percentage allotted to them. If the other defendants don't have percentages allotted to them, then the total amount of the damages would be paid by however you divide up the percentages of these two defendants.

Defense counsel immediately placed the following objection on the record, which was overruled by the judge without expression of a reason:

I wanted to place an objection on the record with respect to the question that was raised or answered by the Court that the jury raised a little while ago. I think the response was probably misled in terms of what percentages they should allot. I think the answer to their question should have been that the—they are to award an amount that is—will fairly and adequately compensate the plaintiff without regard to the percentages that would be allotted to a specific defendant. Sounds to me as if they're working backwards but in any event, to tell them that the percentage would only be a—of OI, if they find they are liable, that's all that they would get, I think improperly misleads the jury in terms of the amount of damages that they may award. I think the accurate statement is that they are to award an amount of damages that will again fairly and adequately compensate the plaintiff without regard for the percentage to the particular party.

Defendants contend the trial court's response to the jury's question violated *Theobold v. Angelos, supra.* In that automobile negligence case plaintiff had settled with two defendants and prevailed at trial against two other defendants who together constituted a single tort-feasor. On plaintiff's cross-appeal for a new trial on damages, the Court addressed the "imperative need for adequate education of juries when settlements . . . are effectuated before or at trial in multiple tort-feasor cases." *Id.* at 303, 191 *A.*2d 465. The Court's concern in these circumstances was the "ever present danger that the verdict will not represent application of the true measure of recovery." *Ibid.* The Court went on to make the following comment, on which defendants rely:

The computation must be made without regard to the number of defendants remaining in the case, or the number of defendants originally in the case, without regard to the total number of persons involved in the incident which caused the damages, including those who have made settlements with plaintiff, and without any deduction based upon what the jurors think plaintiff may or should have

received in those settlements. If the defendant remaining in the case is found to be solely or partly responsible for the incident, then, in assessing the damages, the jury should treat the matter as if no one other than defendant were ever involved in the accident and as if their only problem were to decide on the monetary sum which would fully and fairly compensate the plaintiff for his injuries and damages. And advice should be given that under no circumstances are they to attempt to apportion that amount on the basis of the number of apparently culpable persons involved, and endeavor to return the fraction thereof deemed applicable to the defendant before them. An understanding is essential that when the sum representing full compensation is returned, it will be apportioned as the law dictates among the defendant or defendants found responsible by the jury and the other persons who have made settlements with the plaintiff. A properly compensatory verdict can be expected once the trial court, by its instructions, engenders in the minds of the jurors an appreciation that injustice and inadequate recovery will fall upon the plaintiff if, on the basis of some effort at allocation among the remaining defendants and the settlers, they lower the total sum he is entitled to receive as measured by the elements of damage described above.

[<em>Id.</em> at 304–05, 191 <em>A.</em>2d 465.]

In *Theobold*, the Court's attention to the problem resulted from an objection by plaintiff. Consequently, the opinion focused on possible unfairness to one seeking damages. However, the essence of the opinion was the concern that a failure to instruct that damages were to be assessed without regard to apportionment of fault among defendants would result in a verdict which did "not represent application of the true measure of recovery." 40 *N.J.* at 303, 191 *A.*2d 465.

Here, the jury's question certainly indicated a strong possibility that it was considering inflating its damage awards as a means of assuring that plaintiffs received dollar recoveries deemed by the jury to be appropriate. In that context, the trial court fell into error when it overruled defendants' objection and refused to remind the jury that it was obliged to set damages without regard to the apportionment of fault among defendants. The error was as prejudicial to these defendants as was the similar error in *Theobold*.

The consequence of the *Theobold* error in the circumstances of this case gives rise to another issue. Since we have held that OI was entitled to judgment n.o.v., we can only speculate as to how this jury would have reallocated OI's percentage of fault

had it known that OI was not responsible as a matter of law. It might have assigned OI's percentage of fault entirely to the nonparticipating parties, or, based on the considerable evidence indicating substantial exposure to Kaylo, it might have decided that OCF was up to forty-five percent responsible (in effect, adding all or a portion of OI's percentage to that of OCF). That would indicate the need for a new trial as to OCF (and the other eleven nonparticipating defendants) on liability (as well as on damages in this case for the reasons stated above). However, there is an alternative solution to this problem suggested by our approach to an analogous issue in *Roland v. Brunswick Corp.*, 215 *N.J.Super.* 240, 521 *A.*2d 892 (App.Div.1987). In that case the jury had returned inconsistent verdicts, finding that plaintiff's negligence was not a proximate cause of the accident but that he was nonetheless responsible for a share of the comparative fault. The court said:

> The verdict, therefore, as finally rendered cannot stand. The only question is whether we have the right now to mold the verdict in accordance with the way in which we believe the jury would have responded had it been properly instructed following the initial inconsistency. Our concern in this respect is engendered by the fact that the jury did in the end recalculate the percentage allocation, and the record supports that outcome as well as a finding of 5% plaintiff's negligence. We believe, therefore, that we are thereby precluded from a holding which would ascribe no possibility of self-determination to that action by the jury. On the other hand, our conviction that the jury did in fact intend to find the plaintiff's negligence to have constituted a 5% contribution to proximate cause constrains us from simply setting the verdict aside and remanding for a new trial.
>
> It is our view that the tension here engendered between principles of inviolability of the jury function on the one hand and notions of common sense, fair play and expedition on the other, is best resolved here by resorting to remittitur techniques. *Cf. Bishop v. Harski*, 191 *N.J.Super.* 109, 465 *A.*2d 577 (Law Div.1983). That is to say, the judgment appealed from charges defendant Brunswick with 40% of the responsibility for plaintiff's injuries. In accordance with any reasonable interpretation of the jury's action, it would have been charged with at least 35%. It therefore cannot be in any way prejudiced by a remittitur technique. Plaintiff, on the other hand, was accorded by this judgment the benefit of a zero allocation. This allocation rests on legal error. Moreover, the jury's apparent intention was to charge him with 5% of the responsibility. Since the verdict cannot stand and since we cannot substitute our own judgment based on an apparent rather than a conclusive jury intention, we leave the choice to plaintiff. If plaintiff is willing to accept a molded verdict allocating 5% of the total responsibility to him, then the judgment may be so amended by the trial court. If he is not willing, then we

direct that the verdict be set aside and a new trial on liability be conducted. Plaintiff shall advise the trial court and defendant in writing of his choice within 20 days from the date hereof. If he does not so advise the court, it shall enter judgment reversing the verdict and scheduling the matter for a new trial.

[*Id.* at 245–46, 521 *A.*2d 892.]

Extending *Roland* by giving plaintiffs the option of a new trial on all issues or a new trial on damages only with OCF to be responsible for twenty-five percent (in accordance with the percentage of fault assessed by the jury in this case) would satisfy the interests of justice for both parties. Although OCF continues to deny liability, it has never argued that specific error affected the jury's allocation of fault. Thus, there is no reason to force the plaintiffs at great expense to re-prove OCF's fault if they are satisfied to receive twenty-five percent of whatever damages may be set by the new jury. On the other hand, there is also no reason to require plaintiffs to accept the twenty-five percent limitation. They may want to attempt to prove that OCF was at fault to a greater degree; but in that case they must run the risk of failing to satisfy the new jury that OCF was at fault at all. Therefore, in accordance with the procedure outlined in *Roland*, if plaintiffs desire a damages only trial, they shall so advise the trial court and defendant OCF within twenty days from the date hereof. Otherwise, the trial will proceed on liability and damages.[1]

Affirmed in part, reversed in part, and remanded for further proceedings.

---

[1] Defendants also contend the damage awards were against the weight of the evidence and excessive. In light of the circumstances discussed in section IV, indicating a probability that the jury inflated the verdict to insure a specific recovery, and our disposition of the case, further comment on this issue would appear to us to be inappropriate.