**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1956-17T4

SHELLEY PRITCHETT,

      Plaintiff-Respondent/
      Cross-Appellant,

v.

STATE OF NEW JERSEY,

      Defendant-Appellant/
      Cross-Respondent.

---

Argued March 2, 2020 – Decided April 24, 2020

Before Judges Fasciale, Rothstadt, and Mitterhoff.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Docket No. L-2189-13.

Peter G. Verniero[1] argued the cause for appellant/ cross-respondent (Gurbir S. Grewal, Attorney General, attorney; Melissa Dutton Schaffer, Assistant Attorney

---

[1] In January 2020, a Deputy Attorney General notified us that defendant would be retaining Mr. Verniero—who was not involved at the trial level—to argue before us.

General, of counsel; Kimberly Ann Eaton and Agnes
I. Rymer, Deputy Attorneys General, on the briefs).

Deborah L. Mains argued the cause for respondent/
cross-appellant (Costello & Mains, LLC, attorneys;
Deborah L. Mains, on the brief).

PER CURIAM

This is a failure to accommodate case under the Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49. After a lengthy trial, a jury found that defendant State of New Jersey violated the LAD by denying plaintiff Shelley Pritchett's request for a three-month leave of absence to accommodate her multiple sclerosis (MS). The jury awarded plaintiff approximately $1.8 million in emotional distress and economic compensatory damages and $10 million in punitive damages.

Defendant appeals from the judgment entered in plaintiff's favor after the verdict. Defendant also appeals from an order denying its motion for summary judgment; an order denying its motion to transfer plaintiff's equitable reinstatement claim to the Police and Firemen's Retirement System (PFRS) Board; an order denying reconsideration of those orders; and that part of the judgment denying its motions for a judgment notwithstanding the verdict (JNOV), new trial, and remittitur. Plaintiff cross-appeals from an order

2

permitting defendant to file post-trial motions beyond the deadlines imposed by our court rules.

We affirm on the cross-appeal, but dismiss only that part of defendant's appeal as to certain issues raised in its post-trial motions. On defendant's appeal, we affirm, but remand for further proceedings consistent with this opinion on the amount of punitive damages.

## I. Background

The Juvenile Justice Commission (JJC) hired plaintiff as a corrections officer (CO) in 2006. One year later, she became a senior corrections officer (SCO). As an SCO, plaintiff responded to "codes," escorted inmates within and outside the prison, and occasionally broke up inmate fights. In October 2009, plaintiff married Kareem Pritchett, who had been an SCO for the JJC since 2003.

Plaintiff's last day as an SCO was June 8, 2011, when she separated multiple inmates fighting and was injured on the job. The evidence at trial demonstrated that violent episodes between inmates were common. She injured her back, neck, and knee, and she took medical leave until September 21, 2011. Thereafter, plaintiff requested leave two times.

A-1956-17T4

## A. First leave request

On September 21, 2011, Dr. Orin K. Atlas cleared plaintiff as to her work-related injury, but certified her as unable to work due to a disability unrelated to work. Plaintiff's non-work-related symptoms included a squeezing sensation around her waist, pain in her legs, and numbness in her hands. Dr. Atlas ordered a magnetic resonance imaging (MRI) test of her thoracic spine, which showed a lesion on her spinal cord. He told her the lesion could be a sign of MS.

Dr. Atlas faxed a medical certificate regarding plaintiff's non-work-related symptoms to the JJC's human resources department (HR). The certificate reflected plaintiff's diagnoses of "thoracic spinal cord lesion," and it listed November 1, 2011, as the approximate date for plaintiff to return to work. Plaintiff requested medical leave from the JJC until that date (first leave request).

On September 21, 2011, plaintiff advised HR that Dr. Atlas cleared her for her work-related injury and suggested that she "go on a temporary disability to find out what was going on with [her] personal sickness." Plaintiff spoke to Marisol Velez, who worked as a JJC personnel aide, coordinating the leave-of-absence process for the employees under the direction of a personnel assistant.

A-1956-17T4

Velez testified that, when an employee sought medical leave, she would take the request, collect medical documentation, and ascertain whether the employee had leave time or required temporary disability. As to approval for medical leave, she explained:

> Well, usually when we receive the medical documentation along with the whole process of reviewing the medical [information], we also advise management, meaning the employee's management, in email just indicating that we have received medical documentation. The individual is to be out of work from date to date and if there [are] any questions or concerns to please let us know. Otherwise we will go ahead and process the leave as it's been requested.

If an employee requesting leave had exhausted leave time allowed by the Family Medical Leave Act (FMLA), N.J.S.A. 34:11B-1 to -16, Velez would include such information in her email to management. At the JJC, work-related-injury leave counted as FMLA time. Velez did not typically provide any medical information when forwarding a leave request to an employee's supervisor—she had "to be very vague about it." If leave was granted, Velez sent a standard letter indicating approval for the leave of absence.

On September 23, 2011, Velez sent her standard letter to plaintiff's superior, Captain Kelly Gibson, stating plaintiff requested leave through November 1, 2011, and that her FMLA leave had been exhausted on August 31,

2011. Less than an hour later, Gibson replied, "I am not approving a leave of absence." Velez did not speak with Gibson about the denial, but passed it to Velez's superior, Lisa Quinto. Quinto emailed Gibson on the afternoon of September 27, 2011, stating:

> Captain Gibson, [a]s you are aware, [plaintiff] applied for leave for personal medical reasons unrelated to her work-related injury. Leave is requested through November 1, 2011. Her diagnosis is rather serious without divulging or [breaching] confidentiality. You may wish to consider approving this leave through November 1, 2011. This way we can write to her now and advise her no further leave will be approved beyond November 1 and if she is not medically cleared to return to work, she must resign.
>
> If you determine she must return to work now, based on the medical [information], there will be no way she can return [to work] and we really have not given her warning that management will not approve further leave beyond a request to extend. If she cannot return in November and does not resign, you will have a stronger case to take steps to remove her and be more readily able to defend the removal in an appeal setting. Since its only one plus month, we can give her fair warning she must return and then if she does not, you stand a much better chance of winning an appeal. Please advise. Lisa

Gibson responded the following morning, stating, "I replied to an email stating that I am not approving any leaves."

6

Quinto forwarded her exchange with Gibson to Lisa Bell, Quinto's superior in HR, who then sent it to Felix Mickens, the JJC's Executive Director of Operations. Mickens testified that the JJC's chain of command was the executive director, then himself, superintendents, captains, lieutenants, sergeants, senior correction officers, and correction officers. On September 28, 2011, Bell wrote to Mickens:

> Felix, we do really try as you can see with [Quinto's email] to Gibson. [A]nd then you can see his response.
>
> To deny leave at this point will surely result in a removal (she has a very serious diagnosis) which will be appealed and not upheld. She will not be able to return to work (she incurred a work[-]related injury which resulted in the discovery of an unrelated personal medical condition) and we have not advised her management will not approve further leave.
>
> With removals we have establish[ed] a winning defense. Also, JS has approved other leaves (Darryl Collins and Rose Mosely for starters) of officers who have exhausted [FMLA].
>
> November [1] is right around the corner – management should approve leave through this date as the medical [information] states – we will write to her and say no further leave – if she does not, or cannot return, she can resign [or] we can initiate removal for failure to return from an approved leave of absence.
>
> Can you please discuss this with me? L [Bell.]

A-1956-17T4

Mickens initially testified that he could not recall the outcome of plaintiff's first leave request, nor whether he discussed it with anyone, but he later stated that he told Gibson to approve the request. The day after Mickens received Bell's email, Gibson emailed Quinto, saying, "[a]fter further discussion, the approval can be extended until Nov[ember] 1, 2011." In addition to HR employees, Gibson copied Linda Thomas,[2] who was superintendent of the Johnstone Campus and Gibson's superior.

On October 11, 2011, Bell wrote plaintiff and advised her that the first leave request was approved, with two days to be "leave with pay utilizing [sixteen] earned sick hours," and the remaining days through November 1, 2011, to be leave without pay recorded as personal illness. The letter also stated:

> A review of your medical records reveals that as of August 31, 2011, your [FMLA] entitlement was exhausted[,] and management has advised no further leave beyond November 1, 2011 will be authorized. As a result, you will be expected to return to work on November 2, 2011. If you are not medically released by that time and are unable to return to work on that date, you may resign f[ro]m your position in good standing by completing the enclosed Separation Form (PR-3) and returning [it] to [HR] no later than October 25, 2011. You may also wish to explore your retirement options with the Division of Pensions and Benefits[.]

---

[2] To avoid confusion with plaintiff's neurologist, also named Thomas, we refer to Superintendent Thomas by her name and title.

A-1956-17T4

The next paragraph of Bell's letter cautioned plaintiff: "Please do not allow your leave to expire without requesting an extension." Plaintiff understood this to mean that she "just had to request an extension for additional leave" if she needed leave beyond November 2. The letter further expressed:

> In accordance with [N.J.A.C.] 4A:2-6.2(c), "[a]n employee who has not returned to duty for [five] or more consecutive business days following an approved leave of absence shall be considered to have abandoned his or her position and shall be recorded as a resignation not in good standing.

## B. Second leave request

To address plaintiff's personal medical issues, Dr. Atlas referred her to a neurologist, Carole Thomas, M.D., who plaintiff consulted shortly after making the first leave request. Dr. Thomas told plaintiff that she could not diagnose MS based solely on the one MRI reviewed by Dr. Atlas, so on October 17, 2011, she ordered a series of tests for plaintiff.

On October 18, 2011, plaintiff wrote to Dr. Thomas, requesting that she complete "disability forms to extend [plaintiff's] disability past Nov[ember] 1, 2011." Plaintiff advised Dr. Thomas that a total of six months, "which . . . [would] be March 2012," was the "maximum temporary disability allowed" by her employer. Plaintiff asked Dr. Thomas to decide the length of time for which

she would need temporary disability. Plaintiff also described some aspects of her job and her symptoms, stating:

> I am a state [SCO] in a maximum[-]security prison and work 10pm-6am and a couple times a week at least, I am [mandated] to do a [sixteen-hour] shift which is 10pm to 2pm. With the extreme fatigue, pain, numbness, depression and confusion, I can't see how I could physically do my job properly right now. Also[,] I am required to qualify at the gun range to carry a weapon[,] and with my arms and hands numb, I will not be able to fulfill this aspect of my job.

At this point, plaintiff had not received any treatment for MS.

On October 18, 2011, Kareem Pritchett, accompanied by union representative Anthony Kubala, went to Gibson's office. Kareem Pritchett stated he wanted to make sure Gibson knew the seriousness of plaintiff's condition, and "to see if [Gibson] would extend her leave so [plaintiff] [could] determine what she's [going to] be able to do to come back to work." Kareem Pritchett testified that Gibson said he was "not the only one who made that decision," but he saw no reason for plaintiff's second leave request to be denied if plaintiff's doctor felt she needed to be out beyond than November 1, 2011.

On October 19, 2011, Dr. Thomas completed a medical certificate for plaintiff to provide to HR. The certificate noted plaintiff's MS diagnosis. Dr. Thomas listed March 1, 2012 as the "approximate date patient will be able to

10

return to work." Verbally and in writing, plaintiff requested leave until that date. Plaintiff told HR that she had been diagnosed with MS and requested an unpaid leave to undergo treatment.

Velez processed the second leave request as she had the first, collecting the documentation, emailing Gibson on October 21, 2011, and stating that "this extension will be processed as requested" unless Gibson advised her of "any questions or concerns." About three hours later, Gibson replied, "[w]e cannot accommodate this request." Velez was unsurprised by Gibson's refusal, as Gibson generally did not want to grant extensions to employees who had exhausted their FMLA leave.

Quinto told plaintiff that the JJC was not going to extend her leave. The JJC did not provide plaintiff a reason for its denial, and when plaintiff asked for something in writing, she was denied. Kareem Pritchett testified that Gibson never explained why the JJC denied the second leave request. Mickens testified that he decided to deny the second leave request after consulting with Gibson.

HR did not provide anything in writing to plaintiff after Bell's letter on October 11, 2011, which advised plaintiff that she would be deemed to have abandoned her position if she remained absent without leave. Plaintiff wrote to Bell on November 1, 2011, expressing in part:

> With all due respect, I am formally notifying you that I will not be retiring or resigning from my position as a [SCO] at JMSF. Also[,] per my doctor, [Dr.] Carole Thomas, I will not be returning to work on November 2, 2011. I want to notify you that this is due to a medical disability and not an abandonment of my position.

Plaintiff further noted that "Capt[ain] Gibson, Superintendent Linda Thomas and Assistant Director of the JJC Felix Mickens have all been made aware of my disability, but still denied me an extension [of] leave in order to begin treatment without giving me a reason verbally or in writing."

### C. Accommodation request policy

The JJC's policy was to forward medical leave requests that it expected to deny to the Americans with Disabilities Act (ADA) coordinator, who, in October 2011, was Michael Preisig. Preisig explained that "[t]he assumption is that the ADA coordinator has knowledge of the ADA and the requirement of the ADA so it could be handled appropriately." Plaintiff's second leave request was not forwarded to Preisig.

Michelle Shapiro, the HR manager in October 2011, testified that at the time, accommodation requests for leaves of absence were not forwarded to the ADA coordinator, but "if it was an alternate job search, then it went to the ADA coordinator." Shapiro acknowledged that the applicable ADA policy did not

A-1956-17T4

distinguish leave requests from other accommodation requests, and that all accommodation requests should have been forwarded to the ADA coordinator. Joseph Carbone, an investigator for the Division of Equal Employment Opportunity (EEO), testified that federal and state ADA laws do not require an ADA coordinator be notified of a claim, but the State's policy requires such. He explained that the State's ADA policy is "[m]uch broader" than what the ADA requires.

Preisig testified that if he was informed of plaintiff's second leave request in October 2011 as the policy required, he would have initiated the interactive process—reviewing the medical documentation and job requirements, discussing the issue "with the employee, with management and any other players that might be involved," and possibly seeking legal guidance from the Attorney General's Office. Preisig did not have an opportunity to engage in the interactive process in plaintiff's case because he first became aware of her accommodation request on November 2, 2011, when Kubala contacted him. By that time, plaintiff's leave request had been denied and she was told to apply for retirement or face disciplinary charges.

## D. Disability retirement

Plaintiff testified that she was desperate to find an alternative to resigning or retiring when the second leave request was denied. She asked Velez about the possibility of donated sick leave and was told she could not apply because she "did not fit the criteria for the guidelines." She asked about the possibility of light duty and was told that such was not an option for JJC employees. She said, "I expressed that I was pretty much willing to do whatever just to keep my job." Plaintiff spoke to Kubala and her other union representative, Michael Loffredo, about the denial of her second leave request. Loffredo informed her that Mickens said the JJC would charge her with disciplinary action and move to terminate her if she did not apply for retirement by the end of the first week of November 2011.

Plaintiff was concerned about applying for disability retirement because she did not know if she would remain disabled. However, she was aware that if disciplinary charges were filed against her, she would not be allowed to apply for retirement while those charges were pending. On November 4, 2011, believing she had no other option, plaintiff applied for disability retirement with the Division of Pensions and Benefits (the Division). That day, she met in person with a Division representative, and she submitted medical documentation

A-1956-17T4

about a month later. She was told that the retirement application process "could take most likely six to eight months." Her understanding was that the JJC had no obligation to take her back after she started the process, so she felt "locked in[]."

The Division approved plaintiff's application for disability retirement on July 16, 2012. She received about $2000 per month, plus medical benefits. When she left the JJC, plaintiff was making about $64,000 per year, plus overtime.

### E. EEO complaint and investigation

On November 4, 2011, two days after he learned of the second leave request, Preisig intended to speak to plaintiff about her request when Kubala notified him that she was applying for disability retirement. Preisig took this to mean that plaintiff was no longer seeking an accommodation.

On November 21, 2011, Kubala told him that plaintiff "believed that the JJC had forced her to apply for disability retirement and that she did not want to retire." Preisig said that because plaintiff had already applied for disability retirement, she was no longer a JJC employee. Preisig testified that, as the ADA coordinator, he could "only accommodate people who are [JJC] employees[.]" Preisig spoke to plaintiff on November 30, 2011, advising her to contact the

EEO. Plaintiff filed a complaint with the EEO in January 2012 because she felt the JJC violated her rights, and that it failed to accommodate her, instead forcing her to retire. In the complaint, she sought reinstatement and back wages.

Carbone was assigned to investigate plaintiff's EEO complaint. He "was instructed to meet with [plaintiff], conduct an interview, obtain relevant documents and then submit those along with related information to one of the attorneys that work in [the] agency." Thereafter, the attorney would "put a report together" for Carbone's superiors. Carbone's investigation was "to determine whether an in-house department policy was violated," but the "ramifications of the alleged violation" was not for Carbone to determine.

Carbone presented his final investigative report to the attorney on March 14, 2013. In addition to reviewing a number of emails, letters, policies, and other documents, Carbone interviewed: (1) Plaintiff, on January 24 and September 12, 2012;[3] (2) Gibson, on September 21 and October 10, 2012; (3) Quinto, on October 4 and 18, 2012; (4) Mickens, on October 12, 2012; (5) Superintendent Thomas, on October 12, 2012; (6) Velez, on September 24

---

[3]  At trial, Carbone stated that he also spoke with plaintiff in January 2013, but he did not note that conversation in his report, and the parties dispute its occurrence. The purported interview concerns plaintiff's physical condition.

and October 22, 2012; and (7) retired Captain Craig Stellman, on October 24, 2012.

Carbone noted that Civil Service regulations and plaintiff's union contract "permit[ed] extended unpaid leaves for up to one year. The leaves [we]re discretionary and require[d] approval from the appointing authority." Carbone determined that "[a]cross the board, Gibson did not approve extending their leaves or providing other accommodations to any of" the officers whose requests Carbone reviewed. However, he noted that "[t]here is no dispute that other [COs] obtained personal leaves." Carbone stated that "some [COs] were approved for leave extensions simply due to the vagaries of the approval process, and not because operational considerations or of one's actual entitlement to leave." He concluded that "[t]he manner in which these [leaves] were administered allowed for inconsistencies." At trial, Carbone acknowledged that his investigation demonstrated that some JJC employees were granted more leave time than plaintiff.

Carbone found that plaintiff's second leave request should have been forwarded to the ADA coordinator before it was denied. Because it was not, "the interactive process was never formally conducted." Carbone noted that "[the] JJC did not formally explore other job openings for [plaintiff] for which

17

she might qualify, in part because the interactive ADA process was not actively pursued." Nevertheless, he concluded that "offering another position or even exploring the issue seems moot in [hindsight]." Regarding the second leave request, Carbone stated:

> The only accommodation sought by [plaintiff] was for an ongoing indefinite leave, time she would use to explore treatment options. Her physician used a proposed return to work date of March 1, 2012, but that date was far from fixed. Whether the proposed accommodation is reasonable is beyond the scope of this investigation.

On August 1, 2013, more than a year after her disability retirement was approved and about nineteen months after she filed her EEO complaint, plaintiff received a letter from the EEO advising her of the results of its investigation. The letter stated, in part:

> After interviewing the relevant witnesses and reviewing the pertinent documents, the Office of EEO found that the [JJC] failed to engage in the interactive process, as required by the Department of Law & Public Safety's applicable [standard operating procedure], when it denied your request for an extension of your unpaid medical leave of absence. This failure to engage in the interactive process resulted in a violation of the State Anti-Discrimination Policy. The matter has been forwarded for appropriate corrective action. Your request for reinstatement, however, has been mooted by your approval for disability retirement.

Dr. Thomas continued to treat plaintiff after submitting the medical certificate for the second leave request in October 2011. After a visit on October 28, 2011, Dr. Thomas sent an update to Dr. Atlas. Dr. Thomas noted that plaintiff's numbness and walking had improved somewhat, but she also noted:

> Most likely, given the nature of the patient's job, she is not going to be able to continue in that position which is as a prison guard because of the length of time that she has to work as well as the need to be 100 [percent] at all times, which may not be the case from a [MS] standpoint, so the patient is likely going to start looking for another position.

Plaintiff visited Dr. Thomas again on December 12, 2011. Based on this visit, and in support of plaintiff's application for a disability pension, Dr. Thomas completed a form for the Division. Dr. Thomas identified plaintiff's diagnosis as MS and checked "yes" as to whether the applicant was "now totally and permanently disabled and no longer able to perform his or her job duties and/or any other job." Dr. Thomas added the notation that "numbness, weakness in legs and fatigue preclude work as a prison guard." She also updated Dr. Atlas following her December 2011 examination of plaintiff. Dr. Thomas noted that plaintiff started treatment and had no new symptoms. She wrote:

> IMPRESSION AND PLAN: [MS]. [Plaintiff] is tolerating her Copaxone well, but she does have

residual symptoms from her original attack which affected her thoracic spinal cord. Hopefully, those symptoms will gradually diminish. We have gone over what symptoms could mean that she is having an exacerbation and certainly she has not had any signs of that since I have last seen her.

Plaintiff conceded at trial that, as of December 2011, she remained physically unable to perform the SCO job. However, she testified that the symptoms she had in the fall of 2011 "greatly diminished" after she began treatment, and she only felt something "like a little bit of a current" when running, which did not bother her. In February 2012, Dr. Thomas completed another form for the Division that listed plaintiff's symptoms as "numbness, weakness, [and] difficulty walking." Dr. Thomas testified that she listed these symptoms based on her December 2011 examination of plaintiff.

Plaintiff testified that she was physically able to return to work on March 1, 2012, and that there were no limitations on her ability to perform essential SCO job functions at that time. She did not ask any doctor whether she could return to work as an SCO because she did not believe the JJC would reinstate her.

Plaintiff testified that she remained physically able to work as an SCO from March 2012 through the time of trial in June 2017, explaining that the "first flare-up before I was diagnosed" was the only time she had symptoms that

20

rendered her unable to perform her job duties. Between 2012 and 2017, she had two or three minor flare-ups of her MS where she would "start feeling run down and tired," but she was fine "within a day or two." Plaintiff saw Dr. Thomas on March 12, 2012, and he updated Dr. Atlas on her condition. She told Dr. Atlas that plaintiff continued having "significant symptoms especially when she is active, but she is trying to work through that." Dr. Thomas wrote: "She has been on disability, but she tells me that she is probably going to retire because she is unable to stand for [sixteen] hours a day at work without becoming overtly fatigued and without increasing her risk of falling." Plaintiff, however, disputed having such a conversation in March 2012, explaining that she did not discuss her work situation with Dr. Thomas after submitting her EEO complaint in January 2012. At trial, Dr. Thomas had no independent recollection of what plaintiff told her in March 2012 and only recalled treating plaintiff "from records."

Meanwhile, as part of the disability retirement application process, the Division referred plaintiff to Dr. Richard Katz for an evaluation on March 22, 2012. Dr. Katz is a neurologist who concentrates on "medical legal evaluations where [he is] not the treating doctor." He evaluates a patient's neurologic condition and then offers his "neurologic perspective regarding [whether] they

21

[are] able to work, . . . not able to work[,] or what accommodations they might require."  He knew that the Division relied on his reports in determining disability retirement.  Dr. Katz had an understanding "as to what Pensions [wa]s looking for" in his reports.  He remembered evaluating plaintiff from his records.  In his report directed to the Division, Dr. Katz concluded:

> From my neurologic and general medical perspective, and with reasonable neurological/medical certainty, she is totally and permanently disabled from performing normal functions in her job as a [SCO], again based on the history, results of imaging and spinal fluid studies as well as persistent sensory symptoms.  Her diagnosis of [MS] with predominant myelopathy renders her susceptible to even minor trauma which further underscores her inability to perform full function as a [SCO].  From my neurologic perspective, she could pursue gainful employment in a variety of situations entailing sedentary or light duty.

Plaintiff testified that Dr. Katz's examination was more cursory than examinations performed by other neurologists and that she "was in and out of his office within a couple minutes."  She said she was "back to being normal" when Dr. Katz examined her.

Dr. Katz similarly testified that his physical examination of plaintiff showed her to be "normal" as to "head, neck, and neurovascular assessment," spine examination," "mobility," "mental and language function[s]," "visual, ocular and cranial nerve assessment," "gait and balance," and "limb strength,

tone, cerebellar and coordination functions."  His report indicated that plaintiff told him about "abnormal sensations affecting her bilateral lower extremities," and at trial he acknowledged that "[h]er examination was normal except for the sensory reporting."  The following exchange then occurred:

> Q.  So based on your . . . examination of [plaintiff], everything was physically and neurologically normal except you said some abnormal sensations including her, about her extremities, her lower extremities?
>
> A.  Yes.
>
> Q.  Everything else was normal?
>
> A.  Yes.

Carbone testified that he spoke to plaintiff in January 2013, and plaintiff told him that she had "good days and bad days," and that her "[c]ondition [wa]s not under control."  She stated that she was "not able to come back to work" and "was still having a hard time medically and she didn't perceive when she would be able to come back."  Carbone included this information in an undated, handwritten note directed to the attorney to whom he gave his report in March 2013.

On cross-examination, plaintiff's counsel challenged Carbone's credibility regarding this January 2013 telephone call, and Carbone acknowledged that he memorialized this conversation differently than his other communications with

plaintiff. After speaking with plaintiff in January and September 2012, Carbone typed up his notes, listed the conversations in his report, and included his notes as exhibits. By contrast, following the January 2013 call, Carbone did not type his notes, reference the conversation in his report, or include the handwritten notes as an exhibit.

He testified that the comment in his March 2013 report that plaintiff's "condition was not under control physically or mentally" was based on his January 2013 conversation with her. Carbone acknowledged that "[i]n hindsight" it "would have been good" to include in his report that he obtained this information from plaintiff while speaking to her in January 2013. Regarding a reference in his report to plaintiff's "desire to remain out on leave," he explained that "she did want to stay out on leave while she was undergoing the treatment process and the diagnosis process, but she also wanted to get back to work after she got better."

At the time of trial in June 2017, plaintiff was working two jobs, one at a Home Depot and one working with children in the foster care system. She testified that she would take back her job as an SCO if the JJC offered it.

The judge gave a limiting instruction advising the jury that Kareem Pritchett was a fact witness, not an expert, but could testify as to "his factual

observations as a [CO] and observations of his wife." Kareem Pritchett said that he knew "for a fact" that plaintiff could have performed the SCO job since 2012. He said that "it was rough" when she was first diagnosed, but by trial, she was "still functioning like she did after we got together."

## G. Reasons for denying leave

Mickens testified that the Civil Service Commission authorized the JJC to hire a "certain number of [COs]," and that the JJC was "not legally allowed to hire more" than that. He said that the JJC employed about 400 or 500 COs at any given time. He further explained that each JJC facility had both "fixed" posts, such as guarding the doors, and "collapsible" posts, which the facility could eliminate if necessary. The JJC had to pay overtime to available staff to cover fixed posts if too many employees were on leave.

Mickens also explained that, at one time, the JJC had a light duty program to assist the "heroes" who came back to work, but could not fully perform their job functions. Before 2011, the JJC discontinued the program because it "became a place for people who didn't want to do their jobs to hide out." Mickens said that, when the light duty program existed, there were not "enough people to run our places safely."

Mickens testified that the JJC generally denied leave requests if an employee had exhausted FMLA time because "like the light duty program, . . . there's a small percentage of people who would manipulate the FMLA program or they would try to extend this as a way not to work." The following exchange occurred between defendant's counsel and Mickens:

> Q. So are you saying that the policy to deny leaves in excess of FMLA entitlements was based on the same principles as the denial of light duty, that there was the burden to the organization?
>
> A. Right. The thing is . . . what employees have a right to, they have a right to. If we have – we're not medical doctors, we're not psychologists, you know, we're operations people who depend on these people to tell us whether the person can do the job or not. If we suspect that there's a pattern of abuse, we'll take the necessary steps to try to correct it to be efficient and that's it.

On cross-examination, plaintiff's counsel asked if the second leave request was denied "because of that policy where it goes past FMLA." Mickens responded, "I'm not sure why I made the decision except that . . . we had the right to do it and I made a decision." This testimony diverged from his March 2016 deposition, at which Mickens testified that he did not recall whether he was "involved in the decision to deny [plaintiff] an extension of leave in order to begin treatment."

26

Shapiro testified that the JJC's written leave of absence policy in October 2011 was that "[a] [l]eave of [a]bsence or extension of a [l]eave of [a]bsence requested by employees who have exhausted FMLA/[Family Leave Act] and paid leave entitlements will be subject to the approval of management." She said HR "would make recommendations to management" regarding leave requests after FMLA and other leave were exhausted.

Shapiro testified that plaintiff's second leave request was denied because of "operational need," and "the fact that by all appearances the individual would not be able to resume her job as a [SCO]." When asked about the "operational need" reason, Shapiro acknowledged that no one in management told plaintiff directly that the second leave was being denied for that reason, nor did documents indicate such. Her knowledge of that reason was "based on the protocol at the time that because of operational need[,] management was taking . . . a closer look at leaves that went beyond FMLA entitlement."

When asked if it was a general rule that leaves in excess of FMLA be denied, Shapiro responded, "[a]s a general rule they were being scrutinized more carefully. It wasn't that everyone was being denied. But more were being denied than historically."

27

Q. So . . . is [it] your understanding that these leaves were generally being denied in excess of FMLA entitlements?

A. Yes. Again, where the nature of the leave was becoming indefinite, yes, they were being denied.

Q. So . . . was it based on the indefinite leave or the diagnosis of [MS]?

A. It was the indefinite nature of a leave.

As to her statement that the second leave request was also denied because it appeared unlikely that plaintiff would be able to resume her job as a SCO, Shapiro said her understanding of plaintiff's future abilities was based on the "medical documentation" submitted to HR, not the MS diagnosis. Shapiro pointed to Dr. Thomas's October 2011 letter, which stated that "[m]ost likely, given the nature of the patient's job, she is not going to be able to continue in that position, which is as a prison guard[.]"

However, on cross-examination, Shapiro conceded that the refusal to grant the second leave request "couldn't possibly" have been based on Dr. Thomas's October 2011 letter because Gibson denied the request on October 21 and Dr. Thomas did not write the letter until October 28. In addition, Dr. Thomas's letter was directed to Dr. Atlas and not copied to anyone at the JJC, so HR would not have received it on October 28. The letter would have come

28

to the JJC in the workers compensation file, which would have gone from Dr. Atlas to the Division of Risk Management and then to HR. Shapiro acknowledged that HR only obtained Dr. Thomas's letter that indicated plaintiff would "most likely" not be able to return to work.

When plaintiff's counsel then asked whether Shapiro continued to maintain that "the decision not to grant her the leave was in some way based on" Dr. Thomas's letter, to which Shapiro responded: "Secondarily, yes. I said the . . . primary reason was that Operations was not willing to extend the leave beyond November 1. Secondarily it's supported with the medical documentation of October 28."

## H.  Plaintiff's neurology expert

Dr. Mark Lazar, an expert in neurology and MS, testified regarding the disease's nature and symptoms, and he explained that there are four different types of MS classifications. Each type can be "active or inactive." Dr. Lazar explained that the second type of MS is the most common, known as the "relapsing-remitting" type, which is a recurring pattern of the sudden development of one or more symptoms, typically followed by partial or total recovery.

A-1956-17T4

Dr. Lazar noted that an attack or flare-up could last anywhere from twenty-four hours to several months. The bodily functions affected by attacks were "unpredictably random." There was no expected or typical length of time between flare-ups, but a person with the relapsing-remitting type could go years without having a flare-up.

Dr. Lazar explained that MS was "not really a stroke-like condition where there's a sudden loss of blood supply and an area just goes down." Usually, a patient experiences "some sort of warning signs" that an attack is coming, although there are exceptions. He testified that having MS:

> [D]oesn't . . . tell you how many attacks you're going to
> have, doesn't tell you how bad the attacks are going to
> be and it doesn't tell you what kind of attacks because
> the nature of the nervous system is there's a lot of
> redundant pathways so that if you get a small lesion in
> an area that's not so-called eloquent, meaning it's not
> controlling speech or vision or, you know, strength, the
> answer would be you'd never know that you even had
> an attack.

Dr. Lazar had one MS patient who worked as a police officer "on mountain bike patrol" for "about a dozen years." He had another MS patient who worked as a pilates instructor and dancer.

Dr. Lazar examined plaintiff on October 8, 2015, and he concluded that plaintiff had the relapsing-remitting type of MS. He noted that plaintiff had

attacks in the past, but when he saw her "she was having no symptoms related to [MS] and no neurological abnormalities." He found her to be "stable" and "completely normal." Dr. Lazar's opinion was that plaintiff was able to return to her SCO job without any restrictions.

II.

We begin our review by addressing plaintiff's only contention on defendant's cross-appeal: That it should be dismissed in its entirety because defendant untimely filed certain post-trial motions. We conclude that the judge erred in extending a non-extendable deadline for the filing of post-trial motions, but that such error does not warrant dismissing the entire cross-appeal. Rather, we will address only some of the issues raised in those motions because defendant waived those filed untimely.

The Rule governing a motion for a new trial sets a filing deadline of twenty days after the return of the verdict, as well as other deadlines ensuring the motion's prompt disposition. R. 4:49-1(b). The trial judge may, on his or her own motion, order a new trial not later than twenty days after the entry of judgment, rather than return of a verdict. R. 4:49-1(c). Similarly, the Rule governing a motion for JNOV provides that it must be made "in accordance with

31

the procedure prescribed by R[ule] 4:49-1 (new trial) within [twenty] days after the verdict or the jury's discharge."  R. 4:40-2(b).

Importantly, Rule 1:3-4(c) prohibits enlargements of any of these deadlines.  The trial judge may not enlarge the allowed period when prohibited by the Rule, "regardless of extenuating circumstances."  Baumann v. Marinaro, 95 N.J. 380, 389 (1984); see also Spedick v. Murphy, 266 N.J. Super. 573, 587 (App. Div. 1993) (noting "[h]istorically, our courts have strictly construed R[ule] 4:49-1(b), and denied new trial motions not served within the required . . . period"); Cabrera v. Tronolone, 205 N.J. Super. 268, 270 (App. Div. 1985) (holding that the time could not be enlarged, even though the appellate court was "disturbed by the application of the strict rule with respect to the time for filing a motion for a new trial").

Here, the jury returned its punitive damages verdict on June 15, 2017, so the deadline for defendant to file its motion for JNOV or a new trial was July 5, 2017.  "Where trial is by a jury, the period begins to run from the date the verdict is received in open court and not from the date judgment is entered on the docket pursuant to R[ule] 4:47."  Pressler & Verniero, Current N.J. Court Rules, cmt. 4 on R. 4:49-1 (2020) (citing Gussin v. Grossman, 66 N.J. Super. 107, 109 (Law. Div. 1961)).  Defendant did not file its motion until August 28, 2017.

The State argues that "any error was 'invited error'" because plaintiff's counsel "agree[d] to the post-trial motion schedule without advising the trial [judge] that its schedule might violate the court rules." Immediately after the jury rendered its punitive damages verdict, the judge dismissed the jury, and in conference with counsel, noted that there were "a few things to work out before the verdict is finalized," specifically, an application for plaintiff's counsel fees, the front pay issue, and "the issue of the cap on damages from the Punitive Damages Act." The judge "set everything down" for the return date on July 21, 2017, emphasizing that filing deadlines as to these issues would "flow from that." The following exchange then occurred:

> [DEFENSE COUNSEL]: And then we'll address the post[-]judgment motions at some point in the future to be set?
>
> THE COURT: Yeah. I think – I guess we would do that after the judgment's entered, right or?
>
> [DEFENSE COUNSEL]: Makes sense from my perspective, Your Honor. How do we attack the judgment when we don't know what it says?
>
> THE COURT: I mean, you know, all these things are to figure out what the number is, right?
>
> [PLAINTIFF'S COUNSEL]: Yes.

THE COURT: . . . . Once the number is as it is, we have a judgment and then if you want to make . . . post[-]judgment motions after that, does that make sense?

[PLAINTIFF'S COUNSEL]: I'm fine with that, Judge.

THE COURT: Okay. Okay. Very good[.]

Plaintiff argues that her counsel was "not required to read the mind of defense counsel and intuit that when counsel says 'post-judgment,' he really meant 'post-trial'" and so the exchange did not establish "any consent by [p]laintiff to the late filing of a motion for a new trial."

It does not matter whether plaintiff's counsel intended to consent. Rule 1:3-4(c) unequivocally states that "[n]either the parties nor the [judge] may . . . enlarge the time specified by . . . R[ule] 4:49-1 (b) and (c) and . . . R[ule] 4:40-2(b)[.]" The non-enlargeable deadlines are immutable, regardless of fault or intention. Baumann, 95 N.J. at 388-89; see also Hodgson v. Applegate, 31 N.J. 29, 36-37 (1959) (noting that "clear and definite time limitations for motions" after "entry of the verdict of the jury . . . . may not be enlarged"); Spedick, 266 N.J. Super. at 587 (barring a new trial motion where filed timely with court but served late on counsel); Moich v. Passaic Terminal & Transp. Co., 82 N.J. Super. 353, 361 (App. Div. 1964) (declining to relax deadline as to a new trial motion served after deadline, even though it was timely in courier's possession).

Similarly, although the judge had the authority, on its own motion, to order a new trial no more than twenty days after the entry of judgment, the deadline for that action would have been August 24, 2017—twenty days after the August judgment. R. 4:49-1(c). Thus, even the judge's deadline had passed before the State filed the motion on August 28, 2017. As in Cabrera, 205 N.J. Super. at 270, this court might be "disturbed by the application of the strict rule," but that makes adherence to the rule no less strict and applicable. Thus, we conclude the judge erred in permitting defendant to file the untimely post-trial motions.

Plaintiff contends that the entire appeal should be dismissed because the August judgment must be deemed final and the time to appeal that judgment "was not tolled." According to plaintiff, the time to appeal began to run on August 4, 2017, the date of the August judgment. Thus, the forty-five day deadline for defendant to appeal, provided by Rule 2:4-1(a)(1), was September 18, 2017, and the final date the appellate court could permit a late-filed appeal under Rule 2:4-4(a) was thirty days after that, October 18, 2017. Defendant's appeal was not filed until December 29, 2017, well after even these deadlines. Defendant argues that, regardless of whether the judge should have allowed the late post-trial motions: (1) the November judgment was the final judgment for

appeal purposes, making its appeal timely, and (2) all of "[t]he State's arguments were properly preserved for appeal independently of the post-trial motions."

In Spedick, 266 N.J. Super. at 584, the plaintiff filed a motion for a new trial as to only damages, but missed the then-ten-day time limit. The trial court held the motion was time-barred. Ibid. We agreed, but nevertheless addressed the merits of the claimed trial errors that were the subject of the motion for a new trial, finding none. Id. at 588-98. But in Cabrera, we concluded that issues raised in late-filed motions could not be considered on appeal:

> It follows from the fact that the motion for a new trial was untimely that the appeal from the judgments entered on the verdicts was also untimely and must be dismissed. Appeals from final judgments must be taken within [forty-five] days of their entry (R[ule] 2:4-1(a)) but the time may be extended for [thirty] days upon a showing of good cause and an absence of prejudice if the appeal is served and filed within the time as extended. R. 2:4-4(a). Here the damage trial was concluded on July 31, 1984. Thus[,] the time to appeal would have ordinarily expired on September 14, 1984, subject to a possible [thirty]-day extension to October 14, 1984. As noted[,] defendants appealed October 29, 1984. We are aware that filing and service of a motion for a new trial tolls the time for appeal but only if the motion is timely. R. 2:4-3(e). Here, inasmuch as we have determined the motion was untimely, there was no tolling.
>
> [205 N.J. Super. at 271.]

Like in <u>Cabrera</u>, <u>Rule</u> 2:4-3(e) tolls the running of time for taking an appeal "[i]n civil actions on an appeal to the Appellate Division by the <u>timely filing</u> and service of a motion . . . for judgment pursuant to <u>R</u>[ule] 4:40-2; or for a new trial pursuant to <u>R</u>[ule] 4:49-1[.]" (Emphasis added). But an untimely filing has no tolling effect, so defendant's filing of late post-trial motions did not affect the already pending September 18, 2017 deadline to appeal the August judgment.

However, the judge's decision to vacate the August judgment eleven days before September 18, 2017, creates a critical difference between this case and <u>Cabrera</u>. In <u>Cabrera</u>, there was no question as to the final judgment's continued validity, and once the possibility of tolling was removed, it was simple to calculate the furthest-possible appeal deadline. 205 N.J. Super. at 271-72. Here, by contrast, defendant's deadline to appeal was September 18 or, with an extension, October 18, but the judge vacated the August judgment on September 7, 2017. Thus, the practical effect of the judgment's vacation is there was no valid order for defendant to appeal once those deadlines passed.

The parties dispute whether the judge abused his discretion in vacating the August judgment. But vacating the August judgment did not alter the date of the jury verdict, so it did not affect the untimeliness of the defendant's post-trial

motions.  Moreover, even assuming that the date of the judgment rather than the verdict controlled the deadlines, the rules prohibiting enlargements of time cannot reasonably be read to allow an extension by vacating an order and entering its substantial equivalent at a later date.  Since the post-trial motions' deadline was July 5, 2017, and the judge was unable to alter it, the vacation of the August judgment could not extend that immutable deadline.

Regardless of whether the judge should have vacated the August judgment, it did so, and the August judgment ceased to be a final, appealable order as of September 7, 2017.  Had defendant filed a notice of appeal after the judge vacated the August judgment, we would have dismissed the appeal as interlocutory.  Thus, the appeal deadlines commenced after the judge entered the November judgment.  We therefore reject plaintiff's contention that defendant's entire appeal is time-barred.

Although defendant challenges the judge's individual evidentiary rulings, its argument that those combined rulings deprived it of a fair trial was untimely. Allowing defendant to raise arguments that should have been barred would render meaningless the strict time limitations imposed by Rules 4:49-1(b), 4:40-2(b), and 1:3-4(c).  However, the issue of whether defendant should be permitted

to challenge the quantum of punitive damages requires a somewhat different analysis.

Unlike its argument that punitive damages were unavailable as a matter of law, defendant's challenge to the amount of the punitive damages award was part of its untimely new-trial motion. Accordingly, this challenge could be deemed waived because it was not preserved by a timely post-trial motion. See LaManna v. Proformance Ins. Co., 184 N.J. 214, 223 (2005) (noting that constitutional rights "generally may be waived"); State v. Fortin, 178 N.J. 540, 609 (2004) (indicating "[i]t is well established that a defendant may waive a constitutional right").

But regardless of whether defendant raised it, the issue of the quantum of punitive damages was before the judge. N.J.S.A. 2A:15-5.14(a) provides:

> Before entering judgment for an award of punitive damages, the trial judge shall ascertain that the award is reasonable in its amount and justified in the circumstances of the case, in light of the purpose to punish the defendant and to deter that defendant from repeating such conduct. If necessary to satisfy the requirements of this section, the judge may reduce the amount of or eliminate the award of punitive damages.

Thus, the judge had a statutory duty to review and, if necessary, reduce a punitive damages award, regardless of whether defendant filed a motion for a new trial seeking a reduction. Saffos v. Avaya Inc., 419 N.J. Super. 244, 263

(App. Div. 2011) (stating "[w]hen a punitive-damage award is made, a trial judge is required to determine whether the jury's award is 'reasonable' and 'justified in the circumstances of the case'; if not, the judge must reduce or eliminate the award" (quoting N.J.S.A. 2A:15-5.14(a))).  Because the judge's review of the punitive damage's amount was mandated by statute, it was independent of the State's untimely post-trial motion.  See Curzi v. Raub, 415 N.J. Super. 1, 28 (App. Div. 2010) (noting "the trial judge possessed the authority to reduce the judgment amounts notwithstanding that the [defendants] had not made a timely motion for remittitur").

## III.

Defendant argues that the judge lacked subject matter jurisdiction to adjudicate plaintiff's forced retirement claims because N.J.S.A. 10:5-12.1 (1) grants exclusive jurisdiction of such claims to the Civil Rights Division, and (2) limits plaintiff's available remedy to reinstatement with back pay and interest.  We conclude that the judge had jurisdiction to adjudicate plaintiff's failure-to-accommodate claim.

Whether defendant raised subject matter jurisdiction previously will not preclude it from making the argument now.  "Subject matter jurisdiction can neither be conferred by agreement of the parties nor waived as a defense, and a

court must dismiss the matter if it determines that it lacks subject matter jurisdiction." Royster v. N.J. State Police, 439 N.J. Super. 554, 568 (App. Div. 2015), aff'd as modified on other grounds, 227 N.J. 482 (2017). See, e.g., Macysyn v. Hensler, 329 N.J. Super. 476, 481 (App. Div. 2000) (stating "[t]he issue of subject matter jurisdiction may be raised at any time").

N.J.S.A. 10:5-12.1 concerns "reinstatement, back pay," and provides:

> Notwithstanding any provision of law to the contrary, relief for having been required to retire in violation of the provisions of [N.J.S.A. 10:5-12], shall be available to the person aggrieved by that violation solely through the procedure initiated by filing a complaint with the Attorney General under the provisions of [N.J.S.A. 10:5-1].
>
> Notwithstanding any provision to the contrary of [N.J.S.A. 10:5-17] or any other law, relief ordered for or granted to a person in connection with the person being required to retire in violation of the provisions of [N.J.S.A. 10:5-12] shall be limited to the person's reinstatement with back pay and interest.

N.J.S.A. 10:5-12(a) was amended in 1985 and now states in part:

> It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination:
>
> a.  For an employer, because of the race, creed, color, national origin, ancestry, age, marital status, . . . sex, . . . disability or atypical hereditary cellular or blood trait of any individual, or because of the liability for service in the Armed Forces of the United States or the nationality of any individual, . . . to refuse to hire or

employ or to bar or to discharge <u>or require to retire,</u> <u>unless justified by lawful considerations other than age,</u> from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment[.]

[(Emphasis added).]

Defendant argues that, because plaintiff contends that she was forced to apply for disability retirement due to the JJC's discrimination, a plain reading of the statute deprives the judge of jurisdiction and deprives plaintiff of the remedies available under the LAD, including punitive damages.

When interpreting statutory language, "[t]he primary task for the [c]ourt is to 'effectuate the legislative intent in light of the language used and the objects sought to be achieved.'" <u>Merin v. Maglaki</u>, 126 N.J. 430, 435 (1992) (quoting <u>State v. Maguire</u>, 84 N.J. 508, 514 (1980)). The Legislature's intent "is to be derived from a view of the entire statute" and all provisions "must be read together in the light of the general intent of the act." <u>Hubner v. Spring Valley</u> <u>Equestrian Ctr.</u>, 203 N.J. 184, 195 (2010) (quoting <u>Febbi v. Bd. of Review, Div.</u> <u>of Emp't Sec.</u>, 35 N.J. 601, 606 (1961)).

As our Supreme Court has noted "[i]t is axiomatic that a statute will not be construed to lead to absurd results." <u>Township of Pennsauken v. Schad</u>, 160 N.J. 156, 170 (1999) (alteration in original) (quoting <u>State v. Provenzano</u>, 34

N.J. 318, 322 (1961)); see also Perez v. Zagami, LLC, 218 N.J. 202, 214 (2014) (noting "[i]nterpretations that lead to absurd or futile results are to be avoided"); In re State, 450 N.J. Super. 586, 589 (App. Div. 2017) (declining to follow a "literal reading" of a statute that "would produce absurd results, contrary to its purpose").

Here, defendant's suggested construction of N.J.S.A. 10:5-12.1 contradicts the LAD's purposes. Defendant's interpretation would mean that the LAD's 1985 amendments do not increase the scope of unlawful discrimination, but rather enable employers to better escape the consequences of their discriminatory actions. Defendant tacitly admits that, before 1985, an employee such as plaintiff, maneuvered by a failure to accommodate a disability into choosing between disability retirement or unwarranted disciplinary action, would not have been limited in venue or remedy. If defendant is correct, then after 1985, an employer could discriminate against any employee for any invidious reason so long as that discrimination steered the employee into retirement rather than unemployment.

Plaintiff was not "aggrieved by forced retirement" or "required to retire" by the JJC, which are the prerequisites for the application of N.J.S.A. 10:5-12.1. Rather, she was "aggrieved" by her employer's failure to provide reasonable

accommodation, and she was "required" to risk disciplinary charges filed against her if she could not return to work without the requested accommodation. The fact that she voluntarily opted to mitigate the potential harm to herself by applying for retirement rather than defending against such charges did not rob her of her right to seek a remedy in a jury trial.

## IV.

Defendant argues that the judge erred in denying its motions for summary judgment and a directed verdict. It contends that plaintiff failed to produce sufficient evidence that she was capable of performing the essential functions of her job with a reasonable accommodation, or that the second leave request was a reasonable request for an accommodation. Defendant also contends that its motion for a directed verdict on the issue of front pay damages should have been granted.

We review de novo a ruling on a motion for summary judgment, applying "the same standard governing the trial court[.]" Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 405 (2014) (quoting Murray v. Plainfield Rescue Squad, 210 N.J. 581, 584 (2012)). We must determine "whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder

44

to resolve the alleged disputed issue in favor of the non-moving party." Id. at 406 (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995)).

Similarly, we review de novo a judge's decision on a motion for a directed verdict made pursuant to Rule 4:40-1. Boyle v. Ford Motor Co., 399 N.J. Super. 18, 40 (App. Div. 2008). Like the judge, we "must accept as true all the evidence which supports the position of the non-moving party, according him or her the benefit of all legitimate inferences." RSB Lab. Servs., Inc. v. BSI, Corp., 368 N.J. Super. 540, 555 (App. Div. 2004). If reasonable minds could differ as to which party should prevail, the motion for directed verdict must be denied. Monaco v. Hartz Mountain Corp., 178 N.J. 401, 413 (2004).

"The LAD is remedial social legislation whose overarching goal is to eradicate the 'cancer of discrimination.'" Nini v. Mercer Cty. Cmty. Coll., 202 N.J. 98, 108-09 (2010) (quoting Fuchilla v. Layman, 109 N.J. 319, 334 (1988)). The LAD was "enacted to protect the rights of those with disabilities, and to enable them to vindicate those rights in court." Royster v. N.J. State Police, 227 N.J. 482, 500 (2017). The statute should be "liberally construed 'in order to advance its beneficial purposes.'" Smith v. Millville Rescue Squad, 225 N.J. 373, 390 (2016) (quoting Nini, 202 N.J. at 115); see also Bergen Commercial

Bank v. Sisler, 157 N.J. 188, 216 (1999) (noting "the state anti-discrimination laws, as social remedial legislation, are deserving of a liberal construction").

Discrimination "is still a pervasive problem in the modern workplace," and courts should be "steadfast in [their] efforts to effectuate the Legislature's goal of workplace equality." Smith, 225 N.J. at 390-91 (quoting Quinlan v. Curtiss-Wright Corp., 204 N.J. 239, 260 (2010)). "[T]he more broadly [the LAD] is applied the greater its antidiscriminatory impact." Nini, 202 N.J. at 115 (second alteration in original) (quoting L.W. ex rel. L.G. v. Toms River Reg'l Sch. Bd. of Educ., 189 N.J. 381, 400 (2007)).

Plaintiff alleged failure to accommodate. Although the LAD does not specifically address failure to accommodate, "our courts have uniformly held that the [LAD] nevertheless requires an employer to reasonably accommodate an employee's handicap." Royster, 227 N.J. at 499 (alteration in original) (quoting Potente v. County of Hudson, 187 N.J. 103, 110 (2006)); accord N.J.A.C. 13:13-2.5 (codifying employers' duty to reasonably accommodate persons with disabilities in the workplace).

To establish a prima facie failure-to-accommodate case under the LAD, sufficient proofs must exist to demonstrate that: (1) plaintiff comes within the gambit of the statute as an individual with a disability or perceived as having a

disability, (2) plaintiff "is qualified to perform the essential functions of the job, or was performing those essential functions, either with or without reasonable accommodations," and (3) the employer "failed to reasonably accommodate" plaintiff's disabilities. Royster, 227 N.J. at 500 (quoting Victor v. State, 203 N.J. 383, 410, 421 (2010)).

## A. Essential functions of the job

The State argues that there was insufficient evidence for the jury to conclude that plaintiff was physically capable of performing the essential functions of her job in March 2012—when she would have been obliged to return to work if the second leave request had been granted. Plaintiff's proofs created a jury question.

Defendant raised this argument both in its motion for summary judgment and its motion for a directed verdict. At the summary judgment stage, the motion judge acknowledged that, "[a]s defendant argues, plaintiff is pointing to her own subjective belief that she would have been able to work in March[] 2012, as proof[]" that she could perform the essential functions of her job with a reasonable accommodation. Fact issues existed then, and when defendant moved for a directed verdict, the trial judge correctly determined that nothing had changed.

47

The crux of defendant's argument is that plaintiff was obliged to present expert testimony and prove that she had "medical clearance" from a physician to return to work. It argues that plaintiff's testimony regarding her own physical capabilities was insufficient and that testimony of a treating physician or expert was required. It contends that plaintiff, "who suffers a medical condition not readily understood by a layperson, is simply not qualified to give herself medical clearance to return to work." Defendant stresses that the JJC's policy required medical clearance for any employee returning from medical leave, and it notes that "the JJC literally had no evidence by any physician that [plaintiff] was medically cleared to return to work" in 2011 and 2012.

Expert testimony is required when the issue is beyond the "common knowledge" of lay persons. Kelly v. Berlin, 300 N.J. Super. 256, 265 (App. Div. 1997); see, e.g., Froom v. Perel, 377 N.J. Super. 298, 318 (App. Div. 2005) (requiring expert testimony regarding "complex real estate acquisition and development" because "jurors could not be expected to know . . . whether sophisticated investors would be willing to invest" in a project); Rocco v. N.J. Transit Rail Operations, Inc., 330 N.J. Super. 320, 341 (App. Div. 2000) (where a case "involves a complex instrumentality, expert testimony is needed" to aid

the jury in understanding its "mechanical intricacies" (quoting <u>Jimenez v. GNOC, Corp.</u>, 286 N.J. Super. 533, 546 (App. Div. 1996))).

However, our Supreme Court has noted that "except for malpractice cases, there is no general rule or policy requiring expert testimony as to the standard of care." <u>Butler v. Acme Mkts., Inc.</u>, 89 N.J. 270, 283 (1982). Similarly, there is no general rule or policy requiring expert testimony as to the LAD requirement that a plaintiff be capable of performing the essential functions of his or her job.

Defendant characterizes the question facing the jury as one requiring particular medical knowledge. We disagree. The jury did not need to determine whether plaintiff had MS, how many lesions she had in March 2012, where those lesions were located, or what type of medication was appropriate—these issues would have obviously required expert testimony. Indeed, plaintiff provided expert testimony on a relevant medical issue, namely whether anyone having MS could potentially function at the demanding level required for her job. Dr. Lazar explained the nature of MS, its different types, and the varying range of severity. These facts are not within the ken of the average juror, thereby requiring expert testimony.

As to plaintiff specifically, the jury only had to consider the essential functions of an SCO and determine whether plaintiff would have been capable

of performing them with the accommodation on the second leave request. Having served as an SCO for several years, plaintiff was fully familiar with the requirements of the job, including its physical and mental demands. She acknowledged that, when she was first diagnosed with MS, she could not meet those demands. The jury was entitled to credit plaintiff's testimony that the physical difficulties she experienced in the fall of 2011 no longer troubled her in March 2012 and thereafter that she regained the physical ability to perform her prior job duties.

Defendant contends that "[t]he question of whether she could return to work despite her MS required testimony about her prognosis and probability of permanent disability." Obviously, "[t]he question of the prognosis of an injury and probable permanent disability is one necessarily within the ambit of expert medical opinion (except for disabilities which are apparent to a layman, such as an amputated body member)." Clifford v. Opdyke, 156 N.J. Super. 208, 212 (App. Div. 1978) (holding that the jury's finding of permanent disability lacked factual basis); see also Lesniak v. County of Bergen, 117 N.J. 12, 31 (1989) (requiring expert testimony to establish an injury's "severe nature and lasting extent"). But this proposition is inapplicable here because, unlike in Clifford and Lesniak, plaintiff's prognosis and probability of permanent disability were

not required elements. To establish a prima facie case, plaintiff had to show that she could have returned to work and performed her job in March 2012. She was not required to show that her MS was "cured" or that it was unlikely she would ever suffer another episode and be unable to work in the future.

Defendant also argues that the testimonies of plaintiff and her husband were "improper lay opinion testimony." N.J.R.E. 701 provides:

> If a witness is not testifying as an expert, the witness'[s] testimony in the form of opinions or inferences may be admitted if it (a) is rationally based on the perception of the witness and (b) will assist in understanding the witness'[s] testimony or in determining a fact in issue.

Plaintiff testified as to her own perceptions of her body and her ability to function at different times. Similarly, Kareem Pritchett testified regarding his direct observations of plaintiff and her physical abilities. Moreover, the judge gave the jury a limiting instruction that Kareem was a fact witness, not an expert, and could testify as to only "his factual observations as a [CO] and observations of his wife." Neither plaintiff nor her husband crossed into a realm requiring expert testimony. Fact issues also remained on whether plaintiff could perform the essential functions of her job with a reasonable accommodation.

### B. Availability of reasonable accommodation

Defendant contends that the second leave request was not a reasonable accommodation. Essentially, it argues that: (1) Unpaid leave "is not considered a reasonable accommodation under the LAD" as a matter of law; and (2) even assuming a request for a limited leave is appropriate, plaintiff was seeking an "indefinite" leave, which is unreasonable. Questions of whether a reasonable accommodation was available and provided was for the jury to decide.

In N.J.A.C. 13:13-2.5, the New Jersey Division on Civil Rights (Civil Rights Division) promulgated regulations for accommodating disabled employees. It provides that "[a]n employer must make a reasonable accommodation to the limitations" of a disabled employee, "unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of its business." N.J.A.C. 13:13-2.5(b). Once an employee with a disability requests an accommodation from an employer, "both parties have a duty to assist in the search for [an] appropriate reasonable accommodation and to act in good faith." Tynan v. Vicinage 13 of Superior Court, 351 N.J. Super. 385, 400 (App. Div. 2002) (quoting Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 312 (3d Cir. 1999)). "An employer's duty to accommodate extends only so far as necessary to allow 'a disabled employee to perform the essential functions of his [or her] job. It does not require acquiescence to the employee's every demand.'" Id. at 397

(quoting Vande Zande v. State of Wis. Dep't of Admin., 851 F. Supp. 353, 362 (W.D. Wis. 1994)).

Defendant's reliance on Svarnas v. AT&T Communications, 326 N.J. Super. 59, 75-76 (App. Div. 1999), for the proposition that "unpaid leave . . . is not considered a reasonable accommodation under the LAD," is misplaced for two reasons. First, the Svarnas court did not hold that unpaid leave could never be deemed a reasonable accommodation, only that the "indefinite" unpaid leave, for which the employee "fail[ed] to present evidence of the expected duration of her impairment," was not reasonable in that particular case. Id. at 79. It acknowledged that "[s]ome courts have held that leaves of absence and allowance of time-off for medical care or treatment may constitute reasonable accommodations for disability-related absences," and it noted that whether a particular accommodation is reasonable must be determined on a case-by-case basis. Id. at 74, 79.

Second, when Svarnas was decided in 1999, the regulations stated that reasonable accommodations could include "job restructuring, part-time or modified work schedules, as well as job reassignment and other similar actions." Id. at 74 (citation omitted). The following year, the Civil Rights Division

amended N.J.A.C. 13:13-2.5 to expressly include "leaves of absence" as a reasonable accommodation.  N.J.A.C. 13:13-2.5(b)(1)(ii).

Defendant also relies on Severson v. Heartland Woodcraft, Inc., 872 F.3d 476, 479 (7th Cir. 2017).  In Severson, the court held that, under the ADA, "[a] multi[-]month leave of absence is beyond the scope of a reasonable accommodation[.]"  Ibid.  However, the reasoning in Severson is inapposite to this case because the ADA's reasonable accommodation examples do not expressly include leaves of absence, as the LAD does.  42 U.S.C. § 12111(9); N.J.A.C. 13:13-2.5(b)(1)(ii).  Thus, a Seventh Circuit court's interpretation of the ADA does not inform our LAD analysis.

Defendant's cited precedent fails to support its position that the second leave request was not a reasonable accommodation as a matter of law because it was a leave request.  Indeed, its position contradicts the plain language of the regulations, which contemplate "leaves of absence" as potential reasonable accommodations.

We also reject defendant's contention that the "indefinite" nature of plaintiff's leave request rendered it unreasonable as a matter of law.  This argument, however, is premised on a factual assumption that the jury was not

obliged to accept, namely that plaintiff would not have returned to work in March 2012 had she received the requested accommodation.

The second leave request, on its face, was not indefinite because it expressly defined the three-month period as November 2, 2011, through March 1, 2012. At the time plaintiff made the second leave request, the JJC only knew that she had MS, and Dr. Thomas projected that March 1, 2012, was the "approximate date [plaintiff] will be able to return to work." Unless it made assumptions regarding the nature of MS, plaintiff's potential response to treatment, and her likely long-term ability to function with MS, the JJC had no information in November 2011 from which it could have concluded that she would likely request more than a three-month leave.

Indeed, the JJC's failure to refer the second leave request to the ADA coordinator and engage in the interactive process may have prevented it from obtaining relevant information. Had the parties engaged in a dialogue, the JJC could have (1) inquired further into the medical probability that plaintiff would respond to treatment and regain the ability to perform her job in the specified time, or (2) determined a specific alternate date beyond which it was unable to keep plaintiff's job available for operational reasons. The JJC either concluded that granting the requested three-month leave was unreasonable or assumed

without any basis that three months would be inadequate and would essentially become "indefinite."

In addition, defendant's argument that plaintiff's leave request was indefinite presupposes a jury finding that plaintiff would not have returned to work by March 2012. However, plaintiff presented sufficient evidence for the jury to determine that she responded to treatment and was able to resume her employment. Since the jury was free to conclude from the evidence that plaintiff could have performed the essential functions of an SCO on March 1, 2012, and thereafter, it could also have concluded that the only required accommodation was the one expressly stated in the second leave request—an unpaid three-month leave. Thus, there was no error in submitting the question of reasonable accommodation to the jury.

## C.  Front pay damages

Defendant argues that the judge erred in denying its motion for a directed verdict on the issue of front pay damages because (1) plaintiff failed to prove an entitlement to reinstatement, and (2) the plaintiff's expert's methodology was not sufficiently reliable. We see no error in denying the motion for a directed verdict on these points.

A-1956-17T4

"'Front pay' is a concept that attempts to project and measure the ongoing economic harm, continuing after the final day of trial," experienced by an employee who loses a job "in violation of anti-discrimination laws." Quinlan, 425 N.J. Super. at 350 (citing Donelson v. DuPont Chambers Works, 206 N.J. 243, 251 n.9 (2011)). This remedy is "in keeping with the principle that a perpetrator of discrimination should make the victim of its illegal acts 'whole.'" Ibid. See also Donelson, 206 N.J. at 258 (establishing front pay damages are available in LAD cases "provided there is sufficient proof both to establish that the injury will impair [the plaintiff's] future income and to quantify the lost income"); Picogna v. Bd. of Educ. of Cherry Hill, 143 N.J. 391, 403 (1996) (noting that discharged educator could recover front pay for reasonable period after discharge); Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587, 617 (1993) (stating "back pay and/or front pay" were among the LAD's remedies).

To establish a claim for front pay, a plaintiff must:

> [P]resent[] evidence to prove what she would have earned had she not suffered the wrong committed by defendant, how long she would have continued to receive those earnings, and a reasonable likelihood that she will not be able to earn that amount in the future, such as through alternative employment.
>
> [Quinlan, 425 N.J. Super. at 364.]

The appropriate analysis is to consider the wages a plaintiff would have received after the date of trial, assuming the wrong had never occurred.

Defendant adds an element of proof that is not required. It argues that "[s]ince the PFRS Board has exclusive jurisdiction to render a decision about whether [plaintiff] could be reinstated and her claim for front pay presumes that she would have been able to return to work, [plaintiff's] front pay claims were barred as a matter of law." However, crediting plaintiff's discrimination proofs, the PFRS Board became involved in plaintiff's case in 2011 as a direct result of the JJC's wrongdoing. If the second leave request had been granted and enabled plaintiff to perform her job duties by March 2012, then plaintiff would not have filed the disability retirement application, and a reinstatement determination by the PFRS Board would have been unnecessary. Under defendant's theory, plaintiff needed to not only show what would likely have transpired had the discrimination never occurred, but also that she could have overcome obstacles placed in her path by the discrimination.

Here, plaintiff was not required to prove that the PFRS Board approved, or would have approved, an application for reinstatement to be entitled to front pay damages. Assuming she made a prima facie case for failure to accommodate, she was only obliged to show that, had the second leave request

A-1956-17T4

been granted, she would have returned to her job in March 2012 and would have likely worked for a reasonable period of time. These proofs sufficiently created a jury question as to front pay damages.

We also reject defendant's argument that the jury should not have been allowed to consider plaintiff's expert's testimony regarding front pay damages because it was too speculative and based on a flawed methodology. Awards of front pay damages may "not be based upon speculation," although they frequently "depend on factors that are unknowable and often subject to change, such as future market trends, a plaintiff's employability, and whether the plaintiff would have remained in the same position if not for the discrimination." Quinlan, 425 N.J. Super. at 353.

Plaintiff presented the testimony of Royal Bunin, an expert forensic economist. Regarding future losses, Bunin calculated (1) front pay of $472,639, not including overtime, and assuming plaintiff would retire in March 2031 at age fifty-six with twenty-five years of service; and (2) lost pension benefits of $433,483, assuming a life expectancy of 79.4 years based on the unisex life tables used in New Jersey. On cross-examination, he acknowledged that he did not know or consider whether plaintiff's life expectancy would be shorter due to

her MS. The jury awarded plaintiff front pay damages and lost pension benefits in the exact amounts Bunin calculated.

Rule 1:13-5 provides: "The tables of mortality and life expectancy printed as an Appendix to these rules shall be admissible in evidence as prima facie proof of the facts therein contained." Defendant does not dispute that Bunin used the tables prescribed by the rule. Nevertheless, relying on Kurak v. A.P. Green Refractories Co., 298 N.J. Super. 304, 327 (App. Div. 1997), it argues that Bunin was obliged to also research "statistical data about how people with disabilities work" and "determine if [plaintiff's] life expectancy was lower due to her MS."

Defendant's reliance on Kurak is misplaced. In Kurak, the plaintiff had mesothelioma, and the parties stipulated that "the average life expectancy for a person who has been diagnosed with mesothelioma is six months to two years although some people have lived as long as eight years." Id. at 324. The jury was advised of this stipulation but was also told of the life expectancy tables, which indicated that a person of the plaintiff's age could generally be expected to live "[fifteen] point [twenty] years." Id. at 325.

The plaintiff's counsel, in her summation, stated that "[w]hether [the plaintiff] will be the one who outlives the eight years and take[s] it to his

[fifteen] point [twenty] years, I can't tell you but I can tell you that this is what is known today and this is agreed upon between counsel." Ibid. Because "[t]he trial court clearly explained that the life expectancy figure was not controlling and that plaintiff might live for a shorter or longer period of time," the appellate panel found no error in allowing the jury to consider both the tables and the parties' stipulation. Id. at 327. Indeed, the Kurak court noted that New Jersey courts have specifically rejected that the general tables should not be used for plaintiffs in poor health. Id. at 326-27 (citing Budd v. Erie Lackawanna R.R. Co., 98 N.J. Super. 47, 53-54 (App. Div. 1967)).

Thus, the rationale in Kurak contradicts defendant's suggestion that economic experts have a duty to reject the approved life expectancy tables and, instead, develop particularized predictions based on the plaintiff's specific condition. Bunin was free to utilize the tables, and the State was free to, as it did, challenge Bunin's credibility and the sufficiency of his analysis. This, however, went to the appropriate weight of Bunin's testimony, not its admissibility. Defendant was free to present an expert to refute Bunin's opinions or to give testimony regarding the difference between the life expectancy of persons with MS and persons in general, if indeed such a difference exists.

A-1956-17T4

V.

Defendant argues that the judge erred by failing to reduce plaintiff's damages award by the amount of disability retirement benefits she received. Defendant cites to N.J.S.A. 43:21-55.1 and Gelof v. Papineau, 829 F.2d 452, 454-55 (3d Cir. 1987), arguing that "[a]n offset is appropriate when payment is made by a public sector defendant and such payments are subject to a recoupment" statute.

The judge denied defendant's motion to reduce plaintiff's award, holding that plaintiff's pension monies were "a collateral benefit." The judge reasoned that the plain language of N.J.S.A. 43:21-55.1 provided no basis for repayment, explaining:

> We all know the situation she was in at the time and what she was doing was in accordance with the law and it was proper and the benefits were paid out. So just looking at the plain language of the statute, at the time she was getting her benefits, she was entitled to receive them. So there's no basis now for her to pay them back.

N.J.S.A. 43:21-55.1(a) provides in pertinent part:

> If it is determined by the division that an individual for any reason has received, under the State plan, an approved private plan or for a disability during unemployment, any sum of disability benefits, including benefits during a period of family temporary disability leave, to which the individual was not entitled, the individual shall, except as provided in

A-1956-17T4

subsection (b) of this section, be liable to repay the sum
in full.

This provision is contained in the Temporary Disability Benefits Law, N.J.S.A. 43:21-25 to -71 (TDBL). Under the TDBL, the "division" means the "Division of Unemployment and Temporary Disability Insurance of the Department of Labor and Workforce Development" (UTDI Division), not the division deciding plaintiff's retirement application. N.J.S.A. 43:21-27(c). Plaintiff did not receive benefits under the TDBL from the UTDI Division. Rather, she received a disability pension from PFRS, a different statutory scheme, N.J.S.A. 43:16A-1 to -68.

Moreover, even if the TDBL's recoupment provision was applicable, the UTDI Division determines a prerequisite of repayment that the individual received benefits "to which the individual was not entitled." The UTDI Division—or any persons, court, or agency—made such a determination in this case. To the contrary, the judge found that "what [plaintiff] was doing" at the time she applied for disability retirement "was in accordance with the law and it was proper and the benefits were paid out." Defendant ignores the threshold non-entitlement requirement.

In addition, even assuming both the recoupment statute's applicability and a finding that plaintiff was not entitled to the benefits she received, the

A-1956-17T4

appropriate statutory remedy would be repayment to the Division, not an offset from a jury award of damages.  Theoretically, if the Board were to determine that plaintiff was not entitled to the benefits it already approved and paid, it could seek recoupment, at which point a court could review the Board's determination and consider whether the TDBL's recoupment provision provided a remedy.  Such a remedy, however, would be repayment to the division that paid the benefits, not the deduction from a valid jury award of damages.

We must view the disability retirement payments plaintiff received as a collateral source, and such monies do not provide a basis for reducing a damages award in a LAD case.  In Acevedo v. Flightsafety International, Inc., 449 N.J. Super. 185, 189-91 (App. Div. 2017), this court examined the legislative history and purpose of N.J.S.A. 2A:15-97, the collateral source statute, and held that it does not apply to LAD cases.  We noted that the purpose of the collateral source statute "was to do away with the common-law collateral-source rule," but held that "[n]either the plain language nor the history and purpose of N.J.S.A. 2A:15-97 supports its application to LAD cases."  Id. at 189.

In Acevedo, the plaintiff successfully pursued a disability discrimination and retaliatory discharge claim against her employer under the LAD.  Id. at 186. The jury awarded back pay damages, but the trial court reduced the amount by

a percentage of the unemployment compensation benefits the plaintiff had received.  Id. at 187.  This court held that this was error, noting that the LAD "is remedial legislation, intended 'to eradicate the cancer of discrimination[,]' protect employees, and deter employers from engaging in discriminatory practices."  Id. at 190 (alteration in original) (quoting Jackson v. Concord Co., 54 N.J. 113, 124 (1969)).  We reasoned that "[s]hifting the benefit of unemployment compensation from the wronged employee to the discriminating employer does not serve the LAD's deterrent purpose."  Ibid.

Although the case before us involves disability retirement benefits rather than unemployment benefits, the Acevedo court's reasoning is equally valid. Because the TDBL recoupment provision cited by the State is inapplicable, the collateral source statute would provide the only arguable basis for deducting plaintiff's disability retirement benefits from the jury award.  However, a review of the collateral source statute reveals no reason to apply it in LAD cases, and the LAD's purpose provides a strong reason not to do so.

Accordingly, we conclude the judge did not err by refusing to reduce plaintiff's damages award by the amount she received in disability retirement benefits.

A-1956-17T4

## VI.

Defendant contends that the punitive damages award should be vacated because (1) plaintiff failed to submit sufficient evidence of egregious conduct, and (2) the amount awarded was excessive. We consider these contentions because the judge had a statutory obligation to review the soundness of the punitive damages award.

Punitive damages can be awarded in a LAD case "when the wrongdoer's conduct is especially egregious." Lehmann, 132 N.J. at 624 (quoting Leimgruber v. Claridge Assocs., Ltd., 73 N.J. 450, 454 (1977)). Under N.J.S.A. 2A:15-5.14(c), LAD cases are not subject to the cap by the Punitive Damages Act (PDA), N.J.S.A. 2A:15-5.9 to -5.17. However, with the exception of the statutory cap, courts reviewing punitive damages awards in LAD cases should apply the PDA's requirements. Baker v. Nat'l State Bank, 161 N.J. 220, 231 (1999); see also Lockley v. N.J. Dep't of Corr., 177 N.J. 413, 428 (2003) (noting in a lawsuit against a public entity that "[a]lthough LAD actions specifically are excluded from the statutory cap," the PDA's general requirements for procedural and substantive fairness apply).

Pursuant to the PDA, a jury may award punitive damages "only if the plaintiff proves, by clear and convincing evidence" that the defendant's conduct

was "actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed" by the conduct. N.J.S.A. 2A:15-5.12(a). Proof of negligence, including gross negligence, cannot satisfy this burden. N.J.S.A. 2A:15-5.12(a).

The PDA provides:

> In determining whether punitive damages are to be awarded, the trier of fact shall consider all relevant evidence, including but not limited to, the following:
>
> > (1) The likelihood, at the relevant time, that serious harm would arise from the defendant's conduct;
> >
> > (2) The defendant's awareness of reckless disregard of the likelihood that the serious harm at issue would arise from the defendant's conduct;
> >
> > (3) The conduct of the defendant upon learning that its initial conduct would likely cause harm; and
> >
> > (4) The duration of the conduct or any concealment of it by the defendant.
>
> [N.J.S.A. 2A:15-5.12(b).]

When considering an award of punitive damages, the jury is instructed, in part:

> [P]unitive damages are not to be awarded as a routine matter in every case; they are to be awarded only in

A-1956-17T4

exceptional cases, to punish a party who/which has acted in an especially egregious or outrageous matter and to discourage that party from engaging in similar discriminatory or harassing conduct in the future.

. . . .

To support an award of punitive damages here, you must find that (plaintiff) has proved, by clear and convincing evidence, that the injury, loss, or harm suffered by (plaintiff) was the result of (defendant's) acts or omissions and that either (1) (defendant's) conduct was malicious or (2) (defendant) acted in wanton and willful disregard of (plaintiff's) rights. Malicious conduct is intentional wrongdoing in the sense of an evil-minded act. Willful or wanton conduct is a deliberate act or omission with knowledge of a high degree of probability of harm to another who foreseeably might be harmed by that act or omission and reckless indifference to the consequence of the act or omission.

[Model Jury Charges (Civil), 8.61, "Punitive Damages – Law Against Discrimination" (approved Apr. 2014).]

A. Egregious conduct

Defendant argues that, on the evidence presented at trial, no reasonable jury could have found that its wrongful conduct—specifically the conduct of Mickens, Gibson, or Bell—was "especially egregious."

However, the questions for the jury were whether defendant's conduct overall was especially egregious and, if it was, whether upper management

actively participated in or was willfully indifferent to that conduct. No finding as to the actions of any particular individual was required.

Plaintiff argues that an award of punitive damages "is not limited to 'especially egregious' conduct but may be awarded" for "malicious" conduct or acts done "in wanton and willful disregard of plaintiff's rights." The jury was specifically asked and found that defendant's wrongful conduct was "especially egregious." Model Civil Jury Charge 8.61 uses the term "especially egregious" ten times, clearly indicating that a finding of such conduct is a prerequisite to an award of punitive damages. In context, the charge makes clear that "malicious" acts done "in wanton and willful disregard of plaintiff's rights" are the very types of conduct that are especially egregious, not a separate type of conduct forming an independent basis for punitive damages. Thus, plaintiff's effort to distinguish especially egregious acts from those that are malicious or done wantonly and willfully is misplaced.

Defendant argues that "there was nothing 'egregious' or 'malicious' in forcing a compromised law enforcement official who was unable to safely perform her job duties to resign or retire." This argument ignores significant evidence. The State did not dispute that, unlike plaintiff, other COs had been granted leave in excess of FMLA time. In considering why plaintiff was treated

differently than others, the jury could have examined the information JJC actors had and the actions they took based on that information, as to both the first and second leave requests.

Plaintiff's medical documentation in support of the first leave request indicated that she had a "thoracic spinal cord lesion," and from her conversations with HR personnel, they were aware that her "diagnosis [wa]s rather serious." From this, the jury could have concluded that HR knew that plaintiff had, or likely had, MS. Quinto's email to Gibson and Bell's email to Mickens each supported granting the first leave request, but not for the purpose of accommodating plaintiff or giving her a reasonable time to address her illness. Rather, both emails focused on a strategy by which the JJC would grant a short leave so that it could ultimately defend its decision to permanently remove plaintiff. Mickens, who was second in command at the JJC, testified that he instructed Gibson to grant the first leave request after receiving Bell's email. From this evidence, the jury could have concluded that, upon first learning of plaintiff's illness in September 2011, the JJC (1) schemed to remove plaintiff from her job based solely on the nature of, or its assumptions about, her disease, and (2) granted the first leave request to further that scheme, hoping to bolster

its case for removal while knowing that the permitted leave time was too short for plaintiff to obtain sufficient treatment to resolve her symptoms.

The JJC had official confirmation of plaintiff's MS diagnosis when plaintiff made the second leave request. At this time, it also had Dr. Thomas's estimate that plaintiff would be able to return to work by March 1, 2012. The JJC had no medical information stating, or even suggesting, that plaintiff would not be able to return to work by the stated date. The only way the JJC could have concluded before November 2011 that plaintiff would likely still be unable to perform the SCO's job duties by March 2012 was to make that assumption based on her MS diagnosis.

The jury also could have considered the absence of a credible or consistent reason given by the witnesses as to why the JJC denied the second leave request. Plaintiff was given no reason, although she repeatedly requested one. Shapiro testified that the denial was based on a combination of "operational need," and "also the fact that by all appearances the individual would not be able to resume her job as a [CO]." However, Shapiro acknowledged that the "operational need" reason was only "implied" because, at the time, management was taking "a closer look at leaves that went beyond FMLA entitlement." Moreover, when cross-examined, Shapiro pointed to a letter that was not written until a week

after the second leave had been denied to justify the JJC's conclusion that plaintiff "would not able to resume her job" even if given additional leave.

Mickens testified at deposition that he "wouldn't be able to recall" why the second leave was denied. At trial, he testified that leaves in excess of FMLA time were generally denied, but when pressed as to whether that was the reason in plaintiff's particular case, he responded, "I'm not sure why I made the decision except that I – you know, we had the right to do it and I made a decision." Kareem Pritchett testified that Gibson said he would have no problem granting the second leave request, but then Gibson denied it and never explained why. All of this could reasonably support the jury's conclusion that the JJC decided, as soon as it learned that plaintiff had or likely had MS, that it would remove her because of her diagnosis, making its other asserted reasons disingenuous, after-the-fact justifications.

Further, the jury could have concluded the JJC's failure to follow policy and involve the ADA coordinator was a circumstance that showed an intentional and concerted effort to remove plaintiff solely due to her diagnosis. Shapiro testified that HR did not forward any requests for leave as an accommodation to the ADA coordinator, but had no credible explanation as to why the JJC failed to follow the policy requiring such. Defendant did not dispute that plaintiff was

72

denied the opportunity to engage in the interactive process, and the jury was not obliged to agree with Carbone's conclusion that the issue was moot once plaintiff applied for disability retirement. Rather, it could have believed that avoiding the interactive process was a deliberate act since the process could have resulted in granting the second leave request.

Defendant points to the medical documentation plaintiff submitted in support of her disability retirement application, contending that it "could hardly have changed course" once it received that documentation and that plaintiff "always had the option of applying for reinstatement." This argument ignores the fact that the egregious conduct supporting an award of punitive damages occurred before plaintiff submitted her retirement application. Indeed, the jury could have found that the especially egregious conduct in this case was specifically intended to maneuver plaintiff into a position where her only option was to apply for retirement.

Therefore, the jury could have found from the evidence that the JJC decided to eliminate plaintiff as soon as it suspected that she had MS. To best achieve this, the JJC granted the first leave request only to ensure that it could successfully remove her before she had enough time to regain the physical ability to perform her job. The JJC then avoided the interactive process because

73

it could have resulted in finding an accommodation, such as a three-month leave, that would have enabled plaintiff to return to work. It proceeded to threaten disciplinary charges if plaintiff did not apply for retirement within one week of coming off leave, making her only choices (1) to return to work, which was a physical impossibility within the time given, (2) to face disciplinary charges, which would have, for some indefinite period, prevented her from either returning to work or retiring, or (3) to retire. Plaintiff retired because that was the less-objectionable option in November 2011.

If the jury drew these conclusions from the evidence, then the fact that the JJC "could hardly have changed course" after plaintiff submitted medical documentation to the Division would have been exactly the circumstance the JJC wanted, not one to lessen its culpability. Although, in theory, plaintiff retained the "option of applying for reinstatement" after regaining her physical ability to perform the SCO duties, the jury could have concluded that the JJC would likely have found a means to block her return, legally or not, thus leaving plaintiff with neither a job nor a pension.

Defendant argues that the JJC decision-makers' conduct was not sufficiently reprehensible to warrant such a high award. This argument assumes that the jury was obliged to accept defendant's witnesses at their word and

A-1956-17T4

conclude that they were motivated by the JJC's operational need. As detailed above, however, the jury could have credited other evidence and concluded that the JJC actors (1) engaged in an intentional scheme to eliminate plaintiff due solely to her medical condition, (2) maneuvered her into an untenable position to accomplish this, and (3) misrepresented, at trial, the real motivations for its actions and decisions.

We conclude that plaintiff presented a case from which the jury could have found especially egregious conduct by clear and convincing evidence.

## C. Amount of award

Defendant argues that the punitive damages award was "so excessive that it violates both New Jersey law and principles of Due Process." On this question, a remand is in order. The judge found that the punitive damages award was "at the high end but that doesn't mean it's a miscarriage of justice." The judge rejected defendant's argument that the jury was confused or misunderstood issues, noting:

> I want the record to reflect that the eight jurors that sat on this case, the [c]ourt got no indication that they were confused, impassioned, prejudiced, biased, [or] inflamed. Rather, what the [c]ourt observed was a jury that was intelligent, was one that asked lots of questions, one that took notes, one that was deliberative, one that was impartial and dispassionate and weighed through the evidence here and it's not now

for this [c]ourt to make the decision, they made the decision and their decision was clearly within the realm of what I would consider to be reasonable given their conclusion as to the way . . . defendant's conduct was, the way . . . plaintiff was treated, and also the way this case was defended. I'm not talking about counsel, I'm just talking about the way the case was defended. It was completely reasonable for the jury to come to the conclusions that they made.

"An otherwise valid award of punitive damages will not be set aside unless 'manifestly outrageous,' or 'clearly excessive.'" Smith v. Whitaker, 160 N.J. 221, 242 (1999) (citations omitted); see also St. James v. Future Fin., 342 N.J. Super. 310, 349 (App. Div. 2001) (stating that "[a] jury's punitive damage award should be overturned as excessive only in clear cases").

In general, "[b]ecause punitive damages are not intended to compensate the plaintiff for his or her injuries, they do not 'logically depend on the extent of the injury sustained by an individual plaintiff,'" but instead "'should be sufficient to serve the purpose of deterring future misconduct' by the defendant." Kluczyk v. Tropicana Prods., Inc., 368 N.J. Super. 479, 497 (App. Div. 2004) (quoting Whitaker, 160 N.J. at 242). "On the other hand, while the amount of punitive damages does not depend on the award of a specific amount of compensatory damages or injury to the plaintiff, 'the award must bear some reasonable relation

to the injury inflicted and the cause of the injury.'"  Ibid. (quoting Whitaker, 160

N.J. at 242-43).

Thus:

> The trial court should assess whether the award was either appropriate in light of "the degree of reprehensibility of the [wrongful conduct,] the disparity between the harm or potential harm [suffered by the plaintiff] and the plaintiff's punitive damages award[,] and the difference between this remedy and the civil penalties authorized or imposed in comparable cases," or whether the award reflects prejudice, passion, or mistake warranting a new trial on the amount of punitive damages.
>
> [Baker, 161 N.J. at 231 (alterations in original) (quoting BMW v. Gore, 517 U.S. 559, 575 (1996)).]

We remand for substantial consideration of the Baker/BMW factors.  Although

defendant requests that we undertake such an analysis, the judge is appropriately

situated for this task, given that he observed the witnesses' testimonies.

On appeal, defendant does not argue that the punitive damages award was

the result of "prejudice, passion, or mistake" by the jury.  Rather, it (1) focuses

on the disparity between the jury's awards of compensatory and punitive

damages, (2) asserts that the "degree of reprehensibility" in this case is low

because JJC decision-makers "followed JJC procedures designed to ensure

fiduciary responsibility to New Jersey taxpayers and the safety of prisoners, staff

A-1956-17T4

and the communities surrounding JJC's prisons," and (3) the difference between the award here and "the highest authorized" LAD civil penalty. Defendant is permitted to make these arguments—as well as any other appropriate contentions—as to the Baker factors and the quantum of the damages award.

Regarding the amount of the punitive damages award as compared to the compensatory award, the United States Supreme Court declined to "impose a bright-line ratio which a punitive damages award cannot exceed." See State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 425 (2003) (explaining "[w]hile these ratios are not binding, they are instructive. . . . Single-digit multipliers are more likely to comport with due process"). The punitive damages award in this case was a single-digit multiplier of the compensatory award, less than 7:1, making it "more likely to comport with due process" than an award with a ratio of 10:1 or 20:1, etc. See ibid.

Similarly, the New Jersey Supreme Court has noted: "In considering the disparity between the harm suffered by plaintiffs and the amount of the award, the court may consider, but is not bound by, the Legislature's judgment of five times compensatory damages as a normative measure of the limits of proportion." Baker, 161 N.J. at 231. This suggests that punitive awards in excess of this ratio will not be typical, but it does not, as defendant argues, draw

A-1956-17T4

a line beyond which any award is presumptively unreasonable. Indeed, the fact that the Legislature declined to apply the 5:1 punitive damages cap to LAD cases establishes it contemplated that, at least in some cases, a higher ratio would be appropriate.

Finally, defendant accurately notes that N.J.S.A. 10:5-14.1a provides a maximum civil penalty of $50,000 for LAD violations, which is a factor that could be considered in assessing the reasonableness of punitive damages. Notwithstanding its imposition of these civil penalties in the LAD, the Legislature declined to impose the PDA cap in LAD cases. This suggests that the Legislature did not consider civil penalties under the LAD to be related to the appropriate recovery by an aggrieved individual.

In sum, we affirm on the appeal, but remand for further proceedings on the quantum of punitive damages. On the cross-appeal, we affirm, dismissing that part of the appeal raising certain issues associated with the post-trial motions.

Affirmed in part; dismissed in part; and remanded in part for future proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1956-17T4